### BRABAZON v. BELSHIPS CO., Limited.
### No. 1 of 1950.

United States District Court
E. D. Pennsylvania.
March 25, 1952.

Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, Philadelphia, Pa., for respondent.

CLARY, District Judge.

Michael John Brabazon, the libellant has brought this action against Belships Co., Ltd., Skibs, A/S, Christen Smith & Co., respondent, to recover damages for injuries sustained by a fall in the No. 1 hold of the S. S. "Beljeanne" on December 29, 1949. From the pleadings and proof in this case I make the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. At all times hereinafter set forth libellant was a longshoreman in the employ of Jarka Corporation of Philadelphia, stevedores.

2. The respondent, Belships Co., Ltd., Skibs, A/S, Christen Smith & Co., was at all times hereinafter set forth the owner and operator of the S. S. "Beljeanne".

3. Said S. S. "Beljeanne" was at all times herein material lying in navigable waters at Girard Point in Philadelphia, engaged in taking aboard a cargo of locomotives and tenders for overseas shipment.

4. On December 29, 1949, at 7 o'clock p. m., libellant was directed by his employer to go to work to lash tenders in the No. 1 hold of the S. S. "Beljeanne".

5. S. S. "Beljeanne" was adapted for the carriage of railroad rolling stock and large machinery. Prior to noon of December 29, 1949, two railroad locomotives had been stowed at the bottom and forward part of hold No. 1. Four locomotives had been stowed on the bottom after part of said hold. On the level above the locomotive and resting on steel beams supported by "A"-frames that had been erected over the two locomotives located on the bottom and forward part of the hold, five tenders had been placed abreast. To the rear six tenders had been rested on beams supported in like manner on "A"-frames above the row of four locomotives situate on the bottom of the after part of the hold. The tenders in question measured in excess of 20 feet in length, 8 feet in width, and 11 feet in height and resting on the beams were in close proximity one to the other with very little distance between.

6. Preliminary to the lashing operations on the evening of December 29, 1949, one of the ship's officers had directed the manner and place of lashings to be made by the lashing gangs.

7. In preparation for the lashing operation, libellant's employer had requested the mate to furnish lights to be used in the No. 1 hold. At the time of the beginning of operations at 7 p. m. there were three cluster lights in the hold which had been connected and lowered by the ship's electrician.

8. The manner of operation of the lashing gang was as follows: The gang was split into three teams of three men each and each team took a cluster light and rigged it a short distance over the head of the team and over the place where they were assigned to work by the foreman of libellant's employer. One team commenced the lashing from the forward end of the first row of tenders to the forward bulkhead of the hold on the port side; a second team of which libellant was a member was assigned to make a lashing between the forward and afterrow of tenders and the port side of the

ship; a third team began to lash on the port side between the rows of tenders opposite libellant's team.

9. In order to perform the work assigned, it was necessary for the libellant and the members of his gang to work on a level above the locomotives. To do so it was necessary for libellant and the members of his gang to work at that level on staging made from lumber supplied by the ship.

10. The staging and/or platform scaffold required to be used in the lashing operations was a necessary temporary appurtenance of the ship.

11. At the time libellant and coworkers arrived at the designated locations, they found boards and planks on top of the locomotives and tenders extending between the port side of the vessel and between the locomotives themselves. These boards were loose and varied sizes in length, breadth and thickness. Some were lengths of staging lumber, others sweat boards taken from the ribs of the vessel, others an in-between size. Each gang of lashers rearranged the boards found at the time of arrival at the work to provide scaffolding in the area in which they were to work.

12. Among other platforms and runways located in the hold at the time libellant and coworkers arrived to begin operations, there was an apparent walkway composed of two boards, each about 8 feet in length, and extending between the tops of the cabs of the two forward locomotives.

13. In the course of performance of his assigned duties and after the first lash had been secured, at or about 8:45 p. m., libellant left his team companions on the port side and started toward the walkway referred to in the preceding finding for the purpose of securing from the starboard side of the hold a bar necessary for use in tightening the lashing. He proceeded athwartship across the staging on which he had been working to the cab of the port forward locomotive and started to walk over the walkway between the port and starboard forward locomotive. On his second step one of the two boards broke under his weight and he was precipitated a distance of approximately 20 feet to the bottom of the hold between the two locomotives and rendered unconscious.

14. Because of the necessity of placing the cluster lights immediately above the lashing operations, the area of illumination of each cluster was limited. Due further to the shadows cast by the tenders, the area in which the board walkway was located was in semi-darkness permitting observation of the walkway but of none of its details.

15. The libellant did not test the walkway before using it for that purpose.

16. All of the staging lumber and lashing gear was furnished by the vessel.

17. The walkway across the cabs of the locomotives was not placed in position by the libellant or by any of his fellow employees. Whether it was placed by the crew or employees of other contractors is not known.

18. The walkway so placed contained a board 8 feet in length, 7½″ wide and ¾″ thick, not suited for the purpose for which it was to be used, and which created a dangerous condition for anyone attempting to use it.

19. The walkway as so constructed was an unsafe place for the libellant to work.

20. The failure to furnish libellant with a safe place to work constituted negligence on the part of the respondent.

21. Under the conditions of lighting existing and the appearance of the walkway, libellant was not negligent in failing to notice the inadequacy of one of the boards upon which he was about to step.

22. Libellant was justified in assuming that the walkway consisted of ship's dunnage of adequate thickness and strength to support his weight.

23. Libellant was not guilty of contributory negligence.

24. The libellant sustained injuries to his lower back and left chest together with numerous contusions and lacerations of the head, face, left leg and body. These injuries include fractures of the transverse processes of the *lumbar* vertebrae and fractures of six ribs on the left side. He also

sustained a concussion of the brain. All symptoms referable to the head injury cleared up after several months. The fractures above referred to likewise were healed at time of trial with normal minor displacements. Libellant sustained a low back injury referable to an inter-vertebral disc which has caused him pain from the time of the injury down until the present time and which injury will be permanent. The effect of said low back injury is to disable the libellant from performing heavy manual labor of the type he had previously engaged in and which injury will result in a permanent partial loss of earning power.

25. Libellant while a member of the Armed Forces of the United States sustained an injury to his cervical vertebrae which resulted in his separation from the service for medical reasons and the award by the Government of a 10% disability pension. The injury then incurred was to the upper part of the spine, in no way affecting the lower part of the spine here injured, and did not interfere with the duties of a longshoreman in which he had been engaged for a long period of time up to the time of his accident.

26. After the present injury and in an effort to rehabilitate himself, the libellant has been attending a vocational school under the G. I. Bill of Rights, taking a course in radio and television servicing which will be completed on or about April 1, 1952. This course started in March of 1950 and since that time libellant has been receiving subsistence allowances for himself and family. Had libellant been gainfully employed and earning wages in the position which he occupied at the time of injury, he would not have been entitled to these allowances, and libellant's damages for loss of earnings will therefore be reduced by the amount of said allowances.

27. At the time of the accident libellant had an earning capacity of $5,000 per year. During the time libellant has been unable to work and up to April 1, 1952, he will have lost in wages $11,400. He will have received approximately $3,400.00 up to April 1, 1952 in subsistence allowances making a net loss of earnings for the period of $8,000. In addition he has suffered a permanent diminution in earning capacity of 20% or $1,000 per year.

28. The life expectancy of the libellant herein is 34.16 years. His work expectancy is 30 years.

29. The damages suffered by this libellant including loss of earnings to date, loss of future earning power reduced to present value on a 3% basis, and past, present and future pain and suffering total $35,000.

30. Libellant is entitled to recover from respondent the sum of $35,000.

### Discussion

 This accident happened as a result of the breaking of a board in a walkway between the tops of the cabs of two locomotives stowed in the forward part of the No. 1 hold of the S. S. "Beljeanne". The locomotives, two forward and four aft, had been stowed on the floor of No. 1 hold and lashed in place. Five tenders abreast had been rested on steel beams supported by "A"-frames over the two forward locomotives and six tenders abreast rested on beams supported in like manner above the row of four locomotives situated in the after part of the hold. In order to lash the tenders it was necessary for the lashing gang of which libellant was a member to operate from staging or scaffolding situated on top of the locomotives. It was also necessary from time to time to cross over from one part of the ship to the other and because of the arc of the top of the cabs of the locomotives, walkways were essential, particularly since members of the lashing gang carried heavy cable and turnbuckles. Under these circumstances, respondent, knowing full well that these men had to work at a level above the locomotives in order to accomplish the work assigned to them by the ship, was under an obligation to furnish a safe place to work. This included not only the staging immediately adjacent to the lashing but also walkways across the locomotives for the purpose of moving from one side of the ship to the other. There is no doubt in my mind that such a walkway had been placed by someone at the place where the libellant fell.

This consisted of two boards about 8 feet long spanning the top of the cabs of the two locomotives. One board admittedly was of sufficient strength to hold a person. The other was 7¼″ in width and ¾″ in thickness, and it was this latter board which cracked under the weight of the libellant and precipitated him to the bottom of the hold. The testimony does not disclose and I am unable to determine who actually placed these two boards as a walkway. There are two possibilities in this situation, both of which result in liability on the part of respondent. One, that it was placed there by a member of the ship's crew in which event it became a ship's appliance, even though temporary, and being unsafe and unsuited for the purpose for which it was to be used made the ship unseaworthy. If it was not placed there by the ship's crew but was placed there by some other person working there, then the ship failed to provide a safe walkway and a safe place to work. Under the circumstances of this case that would spell out negligence. The ship has a nondelegable duty of providing a safe place to work. It cannot avoid the consequences of the improper performance by someone else of the duty which it was required to perform. This leads to a discussion of the contention strongly advanced by the respondent that libellant was guilty of contributory negligence.

There are several factors militating against a finding of contributory negligence. First, the libellant had a right to assume that the walkway was placed there by the ship for purposes of passage for those working in the hold. Secondly, a contributing factor was the dimness of the light which was also the ship's responsibility. There was not sufficient light for libellant to have been able to observe immediately the nature of the board over which he was about to travel. Under the circumstances respondent has not shown that the libellant was guilty of negligence in failing to test the board before walking across it

The contention of the respondent that the libellant herein should have descended the ladder of the cab and in the darkness walked between the locomotives on the floor of the hold does not impress me. The testimony discloses that on the floor of the hold there was danger from loose dunnage, greasy skids and running strands of lashing from the locomotives to the sides of the ship as well as an almost total lack of light. It is clear from the evidence that using the avenue suggested by respondent would involve much more serious danger than the method used by this libellant in walking over the tops of the locomotives by means of walkways which had all the appearances of being normal appurtenances of the ship.

## Conclusions of Law

1. The Court has jurisdiction over the parties and subject matter.

2. The respondent, Belships Company, Ltd., Skibs, A/S, Christen Smith & Co., owned and operated the S. S. "Beljeanne" and owed a duty to libellant, who was employed aboard the vessel to secure cargo, to provide him with a safe place in which to work.

3. This duty on the part of the respondent was continuing and could not be delegated or contracted away.

4. The failure to provide proper and adequate staging, illumination, and warning of the presence of the unsafe board across the cabs of the locomotives constituted negligence on the part of the said respondent, which was the proximate cause of the libellant's injuries.

5. Libellant was not guilty of contributory negligence.

6. Libellant is entitled to an award of $35,000 to compensate him for his past loss of earnings, future impairment of his earning capacity, and past, present and future pain and suffering.