## LUCIBELLO v. POPE & TALBOT, Inc.

United States District Court
E. D. Pennsylvania.

March 27, 1952.

Freedman, Landy & Lorry, Philadelphia, Pa., for libellants.

Krusen, Evans & Shaw, Philadelphia, Pa., for respondents.

CLARY, District Judge.

This is an action in admiralty by an employee of a tank cleaning company for injuries incurred due to a fall into a deep tank on the night of February 12, 1950. The facts briefly stated are as follows: Anthony Lucibello, libellant, was employed by National Boiler Cleaning Company as a cleaner and on Friday, Saturday and Sunday, February 10, 11 and 12 of 1950, was engaged in cleaning the deep tanks of hold No. 1 of the S. S. "Russell R. Jones". The tank tops had been removed from all four deep tanks on the night of February 9, 1950 and placed in the wings of the hold. The tank tops were 8' by 14' and weighed approximately one ton each. It was therefore necessary to use the ship's cargo winch to remove the tank tops. After the tops were removed, the 'tween deck was covered and loading operations commenced in the 'tween deck at the same time that the tanks were being cleaned in the lower hold. This, of course, necessitated the use of lights at all times in the lower hold. For the three day period there had been trouble with the lighting equipment in the lower hold due to overloading of the ship's electrical equipment. This resulted in frequent light failures due to fuses blowing out. This condition was made known to the ship's officers by the foreman of libellant's gang and fuses were supplied to the foreman by the ship's engineer for the purpose of replacing blown fuses. Because of the 'tween deck hatch covering it was necessary for all employees of the cleaning company, some thirty or forty in number, to enter and leave No. 1 lower hold through the escape hatch located in the after end of the hold.

On the evening of February 12, 1950, at about 7 o'clock p. m., the foreman in charge "knocked off" the workers for supper. As the men were leaving the two forward deep tanks, the lights failed. At the same time, due to the action of the ship in blowing steam through pipes just washed with kerosene, the atmosphere was filled with fumes which irritated the eyes of the cleaners as they ascended the ladder from the deep tank. Robert J. Crawford, one of Lucibello's fellow workers, came into the lower

hold and was met by the combination of darkness and fumes. He moved away from the top of the ladder to avoid being bumped by the others ascending the ladder, tripped and fell into the No. 2 port tank. Lucibello, the present libellant, after the lights had come on, assisted in removing Crawford from the deep tank and placed him on a 2 foot wide walkway between the two forward tank openings. Because of Crawford's injury, loading operations were suspended on the 'tween deck, a portion of the hatch cover removed, and arrangements were made to lower a metal basket to remove the injured man. As the basket was descending, a fellow employee called to the libellant to look out for the dropping basket. There was another failure of lights and the libellant instinctively moved sideways or backward to avoid the descending basket and he himself fell into the same after port tank from which he had just helped remove Crawford, seriously injuring himself.

There is a sharp conflict of testimony as to the condition of lighting in the lower hold at the time of these two accidents. The testimony for the libellant indicates two separate and distinct lighting failures. On the other hand, respondent's testimony indicates that the lights did not go out at the times of the accidents. The weight of the credible testimony supports the conclusion that the lighting failures described by libellant and his witnesses actually occurred and were the proximate cause of the injuries to both Lucibello and Crawford.

Libellant has based his contentions of liability on two grounds. First, that the light supplied was defective and inadequate and, secondly, that the failure to provide safeguards around the openings of the deep tanks was negligence. Either of these contentions, of course, if established, would impose liability upon respondent for failing to provide libellant with a safe place to work. There was conflicting testimony as to the custom of supplying safeguards around the openings of the deep tanks; the libellant contending that it was a normal and usual custom to provide such safeguards, and the respondent's testimony indicated the absence in maritime circles of such a custom or practice. I am of the opin-

ion that under normal circumstances of working in one deep tank at a time with only one deep tank cover removed, there was no general custom of supplying safeguards. However, under the peculiar circumstances of this case, I find that the failure to supply such safeguards was negligence. Here the four covers had been removed and placed in the wings. They barred passage around the tank openings and restricted the men to a passageway, two feet wide, between the tank openings. It was necessary to move from the forward end of the hold to the after end in order to reach the escape ladders. Even under good lighting conditions, ordinary prudence would indicate the necessity for placing safeguards around the tank openings, at least along the narrow passageways. When to that factor is added the additional circumstance of intermittent light failures, the place was dangerous. The ship was aware of the fact that the men were working with the four deep tank covers removed. It was also aware that they had been working for two days with the 'tween deck hatch closed and completely dependent upon the ship's lights and that they had been cast into utter darkness from time to time over a period of several days because of lighting failures. Under those circumstances, failure to provide some measure of protection around the deep tank openings was negligence. Even if there had been no failure of lights, the space between the unguarded tank openings was not a safe place to work. In the absence of lights it was extremely dangerous for anyone forced to use or stand on the passageway. The ship was likewise negligent in failing to correct the condition which caused the lighting failures after it had at least 48 hours notice of the condition. Merely supplying a box of fuses falls far short of performing its duties to provide a safe place to work.

█ Under the circumstances of this case I have no hesitancy in determining that the ship was unseaworthy in that its lighting system was defective and it was likewise guilty of negligence in failing to provide a safe place to work.

## Findings of Fact

Libellant has submitted requests for findings of fact which comprehensively describe the details of this accident. In conjunction with the preceding discussion, I adopt as my findings of fact libellant's requests for Findings of Fact Nos. 1 to 16 inclusive.

Finding of Fact No. 17 is as follows: In the early evening of February 12, 1950, while National's employees were working in the forward or No. 1 deep tanks, the ship ran steam into the pipes in the after or No. 2 pipes. This caused the kerosene, which had been recently freely applied to these pipes, to vaporize and created a foggy misty condition in the air of the lower hold with acrid fumes irritating to the eyes. No notice of this, before or after it was done, was given to National's employees generally or the libellant specifically.

I adopt libellant's requests for Findings of Fact Nos. 18 to 22 inclusive.

Finding of Fact No. 23 is as follows: A back brace was prescribed for and secured by libellant in June, 1950 which he has worn almost constantly since then to date. The bursitis of his right shoulder has subsided. Libellant suffers from the following conditions: occasional attacks of vertigo, a fracture of the hamate bone of the right wrist, restriction of flexion of the fourth and fifth fingers of the right hand, radiating pain from the hand up the forearm, a right pelvic tilt and right lumbar scoliosis, traumatic coccydynia, severe lumbosacral pain, atrophy of the muscles of the right arm and forearm, traumatic arthritis of the right elbow joint, post-traumatic dystrophy and osteoporosis of the right upper extremity. Motion of the right elbow and wrist is restricted and accompanied by pain in these regions. He has suffered loss of strength in his right hand and arm and is unable to use his right arm for sustained lifting and laborious work. Although the vertebral fractures have healed, he suffers pain in the lower back referrable to a narrowing of the joint space with osteoarthritic sciatica; although the fractured eleventh rib has healed there is normal residual irregularity at the fracture site. As a result libellant is restricted in the use of his back and right arm and hand and cannot engage in manual labor of the type heretofore engaged in by him. His injuries have unfitted him for any laborious work requiring sustained heavy lifting and pulling.

Libellant's request for Finding of Fact No. 24 is adopted with the insertion of the word "sustained" before the last two words.

I adopt libellant's request for Finding of Fact No. 25.

The remaining Findings of Facts are as follows:

26. In September of 1951 libellant resumed gainful employment as a bartender at a weekly wage of $60.

27. Because of libellant's injuries and resulting disabilities he will be restricted in gainful employment in the future with a diminished earning capacity of 33⅓%.

28. Libellant was born on September 17, 1909, is well-built, was healthy and in good physical condition prior to this accident, and in all probability will be gainfully employed until he reaches the age of 65 years.

29. Libellant's earnings immediately prior to the time of the accident averaged $5,000 annually and there have been increases in the wage rates for the work he was doing totaling approximately 20%, so that libellant's earning capacity now and hereafter would average $6,000 annually, had he not sustained his injuries.

30. The damages suffered by the libellant as the result of his injuries, including loss of earnings to date, diminution of earning power in the future to the extent of 33⅓%, during libellant's normal life's work expectancy reduced to its present value at the rate of 3%, medical expenses totaling $801.50, and pain and suffering, past, present and future, amount to $45,000.

31. Libellant is entitled to judgment in the sum of $45,000.

## Conclusions of Law

I adopt libellant's requests for Conclusions of Law Nos. 1 to 8 inclusive as my conclusions of law.

9. The libellant is entitled to judgment in the amount of $45,000 against respondent, Pope and Talbot, Inc.