Daphne P. TATE, As Administratrix of the Estate of George Archie Tate, deceased, and in her own right as widow, and Sidney H. Kelsey, Ancillary Administrator, etc., Libellants,

v.

C. G. WILLIS, Incorporated, Respondent.

No. 7754.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 6, 1957.

Sidney H. Kelsey and L. David Lindauer, Norfolk, Va., for libellants.

Seawell, Johnston, McCoy & Winston, Harry E. McCoy, Jr., Norfolk, Va., for respondent.

WALTER E. HOFFMAN, District Judge.

■ This is an action in admiralty by the domiciliary administratrix and the ancillary administrator of George Archie Tate, deceased, against C. G. Willis, Incorporated, seeking a recovery under 46 U.S.C.A. § 688, more generally referred to as the Jones Act. The first cause of action is for damages claimed to be due by reason of the alleged negligence of respondents. The second cause of action asserts damages for loss of consortium. The third cause of action demands recovery of the economic value of decedent's life. Following the trial, libellants, in their brief, requested that a non-suit be entered as to the second and third causes of action. This request is opposed by respondents for the reason that it is belated and ill-timed. The Court is of the opinion that libellant should not be granted a non-suit as to the second and third causes of action for it is well settled that, under the Jones Act, there can be no recovery either for loss of consortium or for the economic value of decedent's life. There is no reason to subject the respondent to any further litigation arising out of the unfortunate incidents hereinafter related.

The decedent, George Archie Tate, was a 49 year old white male who had been employed by the respondent for approximately 18 months prior to his death. On the trip in which he lost his life, Tate was a crew member of the tug Carteret, employed as an ordinary seaman. Both the tug and the barge J. R. Willis were either owned or operated under bare-boat charters by the respondent herein; the respondent using these vessels in a general freight service conducted over the Atlantic Intra-Coastal Waterway. The barge is of modern design and structure and, at the time of the accident, was only approximately one year old. It is 240 feet in length, has a beam of 43 feet and a depth of 13½ feet. The bow has a steep rake so that the main dock level inclines upward rather sharply. It follows that, in reaching the bow of the barge, a person is required to approach a point which is slightly higher than when amidships. The stern of the barge is square and is fitted with a notch at the center line into which the bow of the tug fits. When the tug's bow is placed in this notch or cradle, with pushing cables attached

from the barge to the tug, the two vessels are operated as a single cargo-carrying unit with the motive power at the stern, thus resulting in the tug's pushing the barge. By reason of the fact that the barge was physically attached to the tug, it became unnecessary for any crew to be maintained aboard the barge.

On the late evening of December 11, 1955, the tug and barge arrived at the Trenton Marine Terminal, Trenton, New Jersey, and docked with the starboard side of the barge along the face of the dock. The tug remained in a pushing position. As the tug's beam is not as great as that of the barge, it follows that when the barge was lying flush alongside the dock, the tug was still approximately 14½ feet from the dock. It was usual and customary, upon arrival at Trenton, New Jersey, for the tug to remain in its pushing position, with its nose in the notch at the stern of the barge. There were no lines running from the tug to the dock as the tug was held in place by the pushing cables attached to the barge. The lines running from the barge and secured to the dock were one long lead bow line from the off-corner spring, and one long lead stern line from a point near the middle of the stern of the barge to the dock, as well as two shorter quarter lines from the starboard side of the barge. On the night of arrival none of the crew went ashore. Beginning at eight o'clock the following morning, the barge, which was loaded with rolls of paper, started discharge operations and approximately one-half of the cargo was unloaded before operations were stopped on the night of December 12. According to the deckhand, Gilliken, the mooring lines were adjusted on the late afternoon of December 12 to permit the proper amount of slack in the lines. To allow for the rise and fall of the tide during the night, it was necessary, of course, to have some freedom in one or more of the spring lines.

In order to go ashore from the tug, the crew would first go from the bow of the tug onto the stern of the barge. There it became necessary to climb a ladder to the catwalk and walk along this upper catwalk to a point in the vicinity of the bow of the barge. Undoubtedly, the bow of the barge was closer to the dock than the remainder of the barge because of the effect of the long lead bow line and the downstream current. Witnesses estimated that the crew members had a step of from 12 to 18 inches from the catwalk of the bow of the barge to the dock when going ashore and, at the time of the accident, the bow was approximately one or two feet lower than the dock.

Sometime following the evening meal on December 12 the Captain[1] and his Mate went ashore to attend a movie. The evidence is undisputed that there were no lights in the locality of the bow of the barge where the crew members were expected, according to respondent, to make the step from the barge to the dock. It should be noted, however, that even the Captain did not leave the barge exactly at the bow. Apparently the deceased had gone ashore prior to the Captain and Mate, as the latter individuals met the watchman, the Chief Engineer, and the deceased at the watchman's shanty near the gate of the Trenton Marine Terminal. The Captain and Mate telephoned a taxicab for the purpose of going into the city of Trenton. It was approximately 8:30 P. M. when the Chief Engineer[2], Melson, arrived at the watchman's shanty for the purpose of making a long distance telephone call. After the completion of the phone call, Melson and the deceased started back to the tug. Melson was carrying a flashlight which he thereafter flashed on the barge at the time decedent endeavored to board same. When the two men came to the stern of the barge, they observed that the vessel was approxi-

---

1. The Captain did not possess a license. He was the holder of an A/B ticket. The law requires nothing more.

2. While acting as Chief Engineer on the voyage in question, Melson held no engineer's ticket but was a tankerman.

mately four feet away from the dock. They walked along the dock toward the bow, and, when at a point approximately 30 to 40 feet from the stern, the deceased apparently decided that he could board the barge at this point. The evidence of Melson, the only eyewitness to the fatal accident, indicates that he warned the deceased not to endeavor to reach the barge at that particular place. His pertinent testimony follows:

"Q. When you got to the dock, will you tell us what took place with reference to getting aboard the barge? A. Well, the barge had swung out.

"Q. Which end had swung out? A. The stern of the barge. And I told Mr. Tate, I says, 'Don't try to get aboard there'. I says, 'Go back to the bow and get on.' And he says, 'No, I can make it all right'. I said, 'Well, wait until the barge swings in'. She was swinging with the tide. She would swing in and swing out. He jumped up on that sill and tried to make it.

"Q. You thought he could make it all right, did you? A. No, sir."

In discovery proceedings, it appears that Melson had made a statement, which he could not recall at the trial, reading as follows:

"Q. You didn't assist him in any way to get on the barge? A. No, sir; I thought he could make it all right."

The witness, Melson, further testified at the trial on cross-examination:

"Q. Now, as you came up alongside, why didn't you go over and board the barge at the stern? A. Because it was too far off.

"Q. What did you do? A. Well, he walked back up the dock, about 30, 40 feet.

"Q. Then what did he do? A. He tried to get on from that point.

"Q. Now at that point I will ask you sir, when he started to go and try to get on the barge, what did you say to him? A. I told him, let's go to the bow of the barge and get on.

"Q. And what did he say? A. Well, he says, 'Heck, I can make it here'.

"Q. Did you say anything to him about the barge swinging out? A. I said, 'Well, wait until the barge swings into the dock'.

"Q. Did he say anything else to you then? A. No, sir. He just jumped up on that walk.

\* \* \* \* \* \*

"Q. (By Mr. McCoy): I will ask you, sir, did you think it was dangerous for Tate to get on at the point where he tried to board the barge? A. Well, yes, sir, I thought it was dangerous.

"By Mr. Kelsey: I object to the opinion, if your Honor please.

"The Court: Suppose it had been two feet that he had to get on.

"The Witness: Me?

"The Court: Yes.

"The Witness: Well, it would still have been dangerous.

"The Court: Suppose it had been one foot?

"The Witness: At nighttime like that?

"The Court: Suppose it had been one foot?

"The Witness: Well, at one foot I guess it would have been a little bit safer. He could have stepped over on it without reaching out to catch to it.

"Q. (By Mr. McCoy): Is that why you cautioned him, sir? A. Yes, sir."

Despite the warnings of Chief Engineer Melson, the deceased endeavored to board the barge by stepping on the wooden sill or cap rail of the dock, leaning out and trying to grab hold of the lifeline around the catwalk, the level of which was slightly below the level of the dock. The deceased fell and his head struck the main deck of the barge, thus causing him to fall overboard between

the barge and the dock. It was estimated that the barge was approximately three, to three and a half, to four feet away from the dock at the point where the decedent fell into the water and his total fall is approximated at from 12 to 15 feet from the dock to the water.

Libellants urge that the respondent did not fulfill the standard of care required in attempting to rescue a crew member lost overboard. If this contention be upheld, the question of any contributory negligence on the part of the deceased could not be considered in mitigation of damages. The Chief Engineer called for assistance as soon as decedent fell into the water, and the deckhands, Gilliken and Willis, were on the scene in a matter of moments armed with flashlights[3]. The deceased was never seen by anyone and presumably he went under the dock or under the barge. As the barge was an unmanned vessel, there were no life jackets aboard, although there were lines available which could have been used had the decedent been observed by the witnesses. The Trenton Fire Department was called and arrived on the scene approximately ten or fifteen minutes later. Dragging operations were conducted for several hours without avail. The dinghy attached to the stern of the tug was put overboard after the authorities arrived and was apparently used in attempted rescue operations. The accident occurred at some time between 8:30 P. M. and 9:00 P. M. Approximately six months later Tate's body was recovered at some distance from the Trenton Marine Terminal. There is no indication that the decedent was anything but normal during the night of his accident.

■ The crux of libellants' case lies in the alleged failure of respondents to provide the decedent with a reasonably safe place in which to work. There were no lights on at the Trenton Marine Terminal in the proximity of the tug or barge at the time of the fatal accident, although lights were on after the Captain returned. There were no outside lights on the barge and none for the purpose of lighting the dock; the barge being equipped only with the usual red and green running lights and a steering light on the top which latter was not in use. There was no physical connection between the tug and dock or the barge and the dock, such as a ladder or gangway[4]. That respondent had full knowledge that members of the crew followed the practice of going ashore is admitted. There is no evidence that the crewmen were ever warned or instructed to leave or board the barge at any particular portion thereof. As it fell within the duty of the respondent to provide a reasonably safe means of ingress and egress to the tug, there was, in this connection, a duty to provide reasonably adequate and sufficient lighting in order that the crew members would be able to observe any dangerous condition in going to and from the barge and dock. While it cannot be said that respondent, in failing to furnish any physical means to get to the dock, is *per se* negligent, stepping from the barge to the dock and from the dock to the barge in total darkness is an obvious unsafe condition which could be remedied by providing sufficient lighting facilities in the locality in which it was anticipated that the various crew members would endeavor to go ashore. The duty to provide a seaworthy vessel encompassed the affording a seaman a reasonably safe means of boarding and departing from the vessel. Standard Oil Co. v. Robbins Dry Dock & Repair Co., D.C.N.Y., 25 F.2d 339, 1928 A.M.C. 1718; Mercado v. United States, 2 Cir., 184 F.2d 24, 1950 A.M.C. 1614. There are numerous cases holding a shipowner liable in providing an improper means of ingress and egress, and it does not seem reasonable to exonerate a shipowner who provides no means of ingress and egress, but relies upon the fact that the

---

3. The cook similarly responded but did not go upon the barge due to his defective eyesight.

4. The evidence discloses that ladders between the barge an dock are sometimes used.

vessel is moored in reasonably close proximity to the dock, particularly when it is known that the members of the crew will leave and return to the vessel during the night hours with no lighting facilities at the place of ingress or egress and with slack in the lines to allow for the rise and fall of the tide [5].

While it is generally conceded that the running lights on the barge would furnish no illumination, respondent insists that the lights on the tug were sufficient to provide illumination for the purpose of boarding the barge. The only illuminating lights on the tug were some lights underneath the overhang of the main upper house, the purpose of which was to illuminate the forward end of the tug, but not the barge. The testimony indicates that the power of these light bulbs was from 40 to 75 watts and, while they may have been of sufficient wattage to enable the members of the crew to climb from the bow of the tug to the stern of the barge, it is abundantly clear that these lights did not furnish any aid to the catwalk of the barge or the place where respondent insists the decedent should have endeavored to board the barge. As respondent was under an absolute duty to furnish a reasonably safe place in which to work, including the duty to provide reasonable and adequate lighting facilities, it follows that liability must be imposed since the lack of lighting facilities were known by the tug's officers and the same manner of ingress and egress had been provided on practically all of the prior trips to Trenton, New Jersey [6]. Pacific Far East Lines, Inc., v. Williams, 9 Cir., 234 F.2d 378, 1956 A.M.C. 1092; Lucibello v. Pope & Talbot, Inc., D.C.Pa., 103 F.Supp. 411, 1952 A.M.C. 767; Brabazon v. Belships Co., D.C.Pa., 103 F. Supp. 592, 1952 A.M.C. 764.

Respondent contends that there is no causal relationship between any negligence on the part of the respondent and the death of the decedent. Reliance is had upon Jackson v. Pittsburgh S. S. Co., 6 Cir., 131 F.2d 668, 670, in which a crew member endeavored to recover damages for injuries sustained when he jumped a distance of approximately six feet from the deck of the vessel to the dock. The crew member had first requested that a ladder be placed over the side for his use but, when this request was declined by one other than in authority, he jumped to the dock with the resultant injuries. The court said:

"The plaintiff was not compelled to jump from the ship. The only expectable injury that he might have suffered from the failure to provide a ladder, would have been some inconvenience or delay in leaving the vessel. This could readily have been avoided or minimized by putting the ladder in place himself or in requesting someone in authority to direct that it be done. When he leaped from the ship under circumstances where injury might reasonably be expected to result, he acted on his own volition, in the pursuit of his personal affairs, and was not injured 'in the service of the ship.' The court was likewise right in dismissing the second cause of action."

To the same effect is Caldwell v. Sutton Lines, Inc., D.C.N.J., 79 F.Supp. 796, which involved a passenger attempting to board an excursion steamer after the gangplank had been removed and all means of ingress and egress from the deck to the dock had been closed. The essential difference in the Jackson case is that the crew member was held to be acting in the pursuit of his personal affairs thereby bringing about an intervening cause, whereas, in the instant controversy it was freely recognized that the members of the crew were at liberty

---

**5.** During the daytime hours the barge is tight to the dock and the fact that many longshoremen go from the dock to the barge under such conditions is immaterial.

**6.** The evidence does not indicate whether decedent availed himself of the opportunity of going ashore on prior trips to Trenton.

to go to and from shore during hours when they were not actually performing their duties on board the tug. The Caldwell case concerned a passenger, as distinguished from a crew member, and the Jones Act has no application where the status of a passenger is involved; furthermore, a proper means of ingress and egress, with adequate lighting facilities, had been provided but had been removed for the purpose of discouraging passage to and from the deck and the dock. In Meintsma v. United States, 9 Cir., 164 F.2d 976, a recovery was denied where libellant, during *daylight hours* and with knowledge that the lower end of the gangplank leading from the vessel to the dock was approximately three feet above the surface of the dock, attempted to jump even though the gangplank could readily have been lowered in place while the vessel was moving to and from the dock; the distinction being that the shipowner had provided a means of ingress and egress which required only a minor adjustment, of which libellant was aware, to render the same absolutely safe. The argument that there is no causal connection between any negligence of the respondent and the decedent is without merit. Certainly if respondent had provided light at the place expected to be the point of ingress and egress, it would have constituted an invitation to the deceased to board the vessel at that particular point. Moreover, there may have been some slight ray of light from the tug which perhaps would have prompted the decedent to board the barge at a point closer to the tug than the bow of the barge. No specific orders were given by respondent to board or leave the barge at the bow thereof, but reliance is had upon the fact that this was the safest point [7]. Merely because one point of boarding may be safer than another does not preclude the right to recover where no physical connection exists between the vessel and the dock and where the lighting is inadequate. Broussard v. United States, 1956 A.M.C. 882. Additionally, if adequate lighting facilities had been made available, it is entirely probable that the decedent may have been better able to grab hold of the lifeline around the catwalk of the barge. Absence of lighting facilities is, in the opinion of the Court, a causative factor between the negligence and decedent's death.

■ Nor can it be said that the assumption of risk doctrine is applicable to the facts of this case. In Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 266, 83 L.Ed. 265, 1939 A.M.C. 1, it is said:

"Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages. There being no defense of assumption of risk where the seaman is without opportunity to use a safe appliance, it seems plain that his choice of a defective instead of a safe one, resulting in injury, does not differ in either the quality of the act or in its injurious consequences, in any practical way, from his correspondingly negligent use of a safe or an unsafe appliance, where its use has contributed to an injury resulting from a breach of duty by the owner."

In the case at bar there was no absolutely safe means of boarding the barge or tug, as the witnesses indicated that even stepping a distance of from 12 to 18 inches from the dock to the barge in total darkness would have some attendant dangers. True, the doctrine of assumption of risk has not been entirely eliminated in cases involving seamen, but the exception seems to occur where a seaman is not required to do a particular act but nevertheless does so, even though there

---

7. The Captain testified that, in leaving the barge, he did not go to the bow but merely "went until it was a safe distance to step before I attempted to step over".

is an obvious danger which he should have avoided, or where the seaman acts in disobedience of orders. Holm v. Cities Service Transportation Co., 2 Cir., 60 F. 2d 721, is not applicable as the seaman was there free to choose between doing what was obviously safe and what was known to him to be dangerous. Here the libellant had only a choice between dangerous conditions, one location being apparently more dangerous than another. The assumption of risk doctrine is understandably confused with the contributory negligence doctrine, but Socony-Vacuum Oil Co. v. Smith, supra, has so expressed the rule that the exception must fit the applicable facts of each particular case. Holding that the decedent was not afforded an absolute safe place to board the barge on the night in question, the Court is of the opinion that the assumption of risk defense cannot be successfully maintained but, as hereinafter noted, the decedent was guilty of contributory negligence.

 Libellants insist that, irrespective of questions of negligence, causal relation, assumption of risk or contributory negligence, the right of recovery is sustained by reason of the alleged failure of respondent to fulfill the standard of care required in attempting the rescue of a crew member lost overboard. As heretofore noted, if libellants are correct in this contention, the contributory negligence of the decedent could not be considered by the court in mitigating the damages. In Harris v. Pennsylvania R. Co., 4 Cir., 50 F.2d 866, 868, Circuit Judge Soper had this to say:

"But we have no doubt that a legal obligation rests upon a ship to use due diligence to save one of the crew, who, by his own neglect, falls into the sea; and that the owners are liable *if, by failing to perform this duty, his life is lost.*"

In 1947 the Fourth Circuit passed upon the same question in Sadler v. Pennsyl-

vania R. Co., 159 F.2d 784. In both the Harris and Sadler cases, the seamen were actually seen in the water. The legal obligation breached in the Harris case was that the decedent, having shouted for assistance and having actually called for a line to be thrown to him, was drowned because the hawser which was thrown overboard was too heavy to reach him, although a heaving line capable of being thrown a greater distance was nearby, and no other efforts to rescue him were made. In Sadler, the seaman was observed between barges for several minutes treading water but no life saving equipment was readily available. In both cases, the court held that whether due diligence might have saved the seaman's life was a question of fact for the jury to decide under the particular evidence of each case. Likewise, in Kirincich v. Standard Dredging Co., 3 Cir., 112 F.2d 163, 1940 A.M.C. 868, the crew member was observed overboard swimming and treading water for a period of time in which reasonable rescue efforts may probably have been successful. Admittedly the law imposes an absolute duty on a shipowner to exercise every reasonable means to rescue a seaman who is overboard, but such reasonable means must be considered from a factual viewpoint and the lack of adequate lights or searchlights cannot improve libellants' position in seeking a recovery on this theory. Bearing in mind that there existed only a matter of from three to four feet between the barge and the dock, the difficulties presented in manipulating a small boat between the barge and dock are manifest[8]. Likewise, unless the decedent was observed in the water, there appeared to be no reason for throwing life lines or life rings in the water. It must be recalled that the Engineer, Melson, continuously played his flashlight on the place where decedent entered the water but decedent was never seen to come to the top by Melson or by Gilliken and Willis who appeared within a matter of

8. While there is evidence that the dinghy was apparently lowered from the tug, the testimony does not indicate that the boat was brought to the position between the barge and dock where decedent fell.

seconds and likewise used flashlights. It is possible that the decedent's body floated under the dock through a ten foot opening nearby, but this would have necessitated a member of the crew jumping into the icy waters of the Delaware River during the middle of December with no reasonable assurance that the decedent's body could have been located. There is no evidence to the effect that any searchlight or flashlight would display any appreciable area under the dock. It would be highly speculative for this Court to determine that any other efforts on the part of respondent would have been productive in saving the decedent's life. Clearly there must be some causal relation between the alleged breach of legal obligation on the part of the shipowner and the loss of life. While the language in the Sadler case carries with it an inference that the legal obligation is breached where life preservers or life rings are not readily accessible (as is true in the instant case), this Court does not believe that the Fourth Circuit intended to make the shipowner an insurer and some reasonable inference of probable success in saving the life of the seaman must exist. Even assuming that other things could have been done by the crew members in using life rings, life lines, or causing a member of the crew to jump overboard in the small space available, there is no suggestion that any of these efforts would have assisted in saving the seaman's life. While all of these conditions properly present an issue of fact, the Court concludes that libellants have not met the necessary burden to justify a recovery on this theory.

On the question of damages, there is no evidence that the decedent suffered any physical pain or agony prior to his death and presumably he was knocked unconscious when his head struck the deck. The decedent was married to the domiciliary administratrix, Daphne P. Tate, in Washington, North Carolina, on February 11, 1928. The couple apparently lived together in complete harmony during their entire married life. Decedent's gross earnings for the calendar year 1955 were $3,038.25. The damages recoverable in this action are dependent upon the amount Daphne P. Tate could reasonably have expected to receive from the decedent during the time of their married life. The evidence conclusively shows that Daphne P. Tate was solely dependent upon the decedent, and a fair estimate of her dependency is $200 per month, or $2,400 per annum. The life expectancy of the decedent was 22.12 years at the time of his death and the present value of $1 discounted at 3½% for 22 years is $15.17. As of the date of the submission of Mrs. Tate's final testimony, it would appear that she had lost approximately $3,200 in anticipated wages which would have been earned and paid to her if George Archie Tate, Sr., had lived. Computing the life expectancy based upon the anticipated contributions of $2,400 per annum, and making due allowance for the hazardous occupation in which the decedent was engaged, the Court is of the opinion that the libellants, subject to the mitigation of damages for contributory negligence as hereinafter indicated, would be entitled to the sum of $30,000 for present and future loss of contributions reasonably expected to have been made by the decedent to the ultimate beneficiary. The Court is further of the opinion that the award in the sum of $30,000 must be reduced by 33⅓% because of the contributory negligence on the part of the decedent, and a decree should be entered in favor of libellants on the first cause of action herein in the sum of $20,000, said decree providing that, after the payment of reasonable attorney's fees, the balance of said award shall be paid to Daphne P. Tate in her own right. As to the second and third causes of action, said decree will deny any recovery to libellants.

Proctors for libellant will prepare a decree in accordance with this opinion, which is adopted as the Court's findings of fact and conclusions of law pursuant to General Admiralty Rule 46½, 28 U.S.C.A., and, after presentation to proctors for respondents for inspection, present the same to the Court for entry.