**SUPERIOR OIL COMPANY, Appellant,**

v.

**Bufford TRAHAN, Appellee.**

**Bufford TRAHAN, Appellant,**

v.

**SUPERIOR OIL COMPANY, Appellee.**

**No. 20052.**

United States Court of Appeals
Fifth Circuit.

Aug. 27, 1963.

George V. Baus, W. Ford Reese, New Orleans, La., J. J. Davidson, Jr., Lafayette, La., Adams & Reese, New Orleans, La., for Superior Oil Co., respondent-appellant.

Hugh E. Brunson, Crowley, La., Felicien P. Lozes, New Orleans, La., for Bufford Trahan, appellee.

Before HUTCHESON and GEWIN, Circuit Judges, and CONNALLY, District Judge.

GEWIN, Circuit Judge.

Bufford Trahan, the libellant, filed suit against his employer, Superior Oil Company, under the admiralty jurisdiction of the court, seeking damages for personal injuries alleged to have been sustained in an accident which occurred on March 31, 1959. Trahan brought suit claiming negligence under the Jones Act; alleging unseaworthiness; and seeking maintenance, cure and wages. Both parties appeal, and the questions involved relate to the proof of claimed liability as the result of alleged negligence; un-

seaworthiness of the vessel; a purported release of liability; and the quantum of damages awarded. The amount allowed for maintenance has been paid. This is a non-jury case.

Trahan, a seaman in the employ of Superior, was injured in passing from one of Superior's vessels on which he had been visiting, to another of Superior's vessels on which he worked. The two vessels, the Rambio and the Supco V, were tied up at an off-shore drilling rig belonging to Superior in the Gulf of Mexico approximately 10 miles from Cameron, Louisiana. Trahan worked on the Rambio and had been visiting on the Supco V. He alleged that Superior was negligent in not providing a safe means of passage from one vessel to the other, and that the Rambio was thereby rendered unseaworthy in the circumstances of this case. Superior's defense was that Trahan was on a private mission at the time, that his own negligence caused his injury, that the vessels were seaworthy, and that in any event, Trahan had executed a release which limited his recovery to amounts due and payable under Louisiana's Workmen's Compensation Laws.

Earlier in the afternoon on the day of the accident, Trahan and another member of the crew of the Rambio went aboard the Supco V at a time when the sea was moderate, running up to approximately 3 feet in height. Their transfer from one vessel to the other was by the simple expedient of waiting for the vessels to swing together and stepping or jumping from one to the other when the decks reached a level or near level position. They were to return in the same manner, which was the only method of transfer provided. When they returned however, the sea was heavier, "choppy", and the waves were 5 to 6 feet high. As Trahan was attempting to step from the top of the bulwark of the Supco V onto the Rambio, the latter was falling away or dropping, while at the same time the Supco V was rising. Due to the difference in the size and structure of the two vessels and the manner in which they were moored, the bow of the Supco V was located near the midship section of the Rambio. The 2 vessels pitched, but not in unison. While the Rambio was going down at the bow and up at the stern, the Supco V would go up at the bow and down at the stern. The top of the bulwark of the Supco V was about 5 inches in width, but the bulwark around the stern of the Rambio was only 1 inch in width, making it necessary for Trahan to jump or step over the bulwark to the deck outboard of the cockpit space, which was about 24 inches in width. In coming back to the Rambio, Trahan had to clear the open water, the bulwark or rail of the Rambio, and land on the deck space inboard of the bulwark, at the same time dropping a distance of from 2 to 3 feet in height. Trahan landed on the deck of the Rambio, fell to his knees, then tumbled over into the cockpit. His knees were injured and ultimately the patella or kneecap of each knee was surgically removed.

The District Court, after a full and complete trial of the issues involved, relied on Tate v. C. G. Willis, Inc., 154 F.Supp. 402 (1957, U.S.D.C. ED Va.), and other authorities, to the effect that:

"The duty to provide a seaworthy vessel encompassed the affording a seaman a reasonably safe means of boarding and departing from the vessel."

The trial court concluded:

"Here, the court finds that the vessels involved were unseaworthy; and further, in respect to libellant's right to recover under the Jones Act, we find actionable negligence by respondent." (Rogers v. Missouri Pacific R. R. Company, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; and Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511).

See also Annotation 4 L.Ed.2d 1777; Benedict, the Law of American Admiralty (6th Ed.) Vol. 4, 1962 Supp. p. 57. Trahan was returning to the Rambio after having been aboard the Supco V

pursuant to a custom and practice known and recognized by respondent's vessels engaged in offshore work. Both vessels were on a stand-by duty status. Trahan's visit was terminated when the Supco V received orders requiring her to leave the rig. The District Court found the respondent guilty of negligence " * * * and that such negligence consisted specifically in failing to provide a reasonably safe means of ingress and egress to and from its vessel." The Court concluded that the Captain of the vessel to which Trahan was returning, who was present on the vessel and watched Trahan boarding, could have done three things to minimize the appar-

ent danger in coming aboard: (1) he could have slacked off the bow line, which would have synchronized the movements of the two vessels; (2) he could have passed a line between the boats; or (3) he could have offered a steadying hand to Trahan. Upon a close examination of the record, there being no reasonably safe means of ingress and egress, we agree that in the circumstances, the doing of one of the three things mentioned, all three of which were reasonable, would have lessened the danger attendant upon Trahan's making the transfer by the only means provided; and that the Captain's failure to so act proximately caused the injury.[1]

1. The following is from the District Court's opinion:

"Respondent relies primarily upon Meintsma v. United States, 9 Cir., 164 F. 2d 976 (1947) and Jackson v. Pittsburg S.S. Co., 6 Cir., 131 F.2d 668 (1942), and the general principle that the owner must see that the ship is in a fit state as to repairs and equipment, in respect to seaworthiness, 79 C.J.S. Seaman § 192, p. 679; and that as to negligence under the Jones Act, the owner is not bound to furnish an accident-proof ship, but is bound only to exercise reasonable care to see that the ship and its appurtenances are reasonably safe. 79 C.J.S. Seaman § 192, pp. 681–683.

"The Meintsma and Jackson cases do not, in our opinion, apply to the situation found here. In each, the crew member was held to be acting in the pursuit of his personal affairs thereby bringing about an intervening cause. See Tate v. C. G. Willis, Inc., D.C., 154 F.Supp. 402, 407 (1957), explaining the Jackson case. In Tate, the deceased seaman was returning to his ship after liberty and died as a result of injuries which the Court found resulted from an unsafe means of ingress and egress from the ship. Here, Trahan was returning to the Rambio after an absence aboard Supco 5 while in a standby status and pursuant to a custom authorized and recognized by respondent's small vessels engaged in offshore work. We find the following observations of the Court in the Tate case to be especially pertinent here:

" 'While it cannot be said that respondent, in failing to furnish any physical means to get to the dock, is per se negligent, stepping from the barge to the dock and from the dock to the barge in total darkness *is an obvious unsafe condition which could be remedied* by providing sufficient lighting facilities in the locality in which it was anticipated that the various crew members would endeavor to go ashore. *The duty to provide a seaworthy vessel encompassed the affording a seaman a reasonably safe means of boarding and departing from the vessel.*' (154 F.Supp. 402, 406. Emphasis added).

"The duty of the owner to take affirmative action when prevailing conditions require such to prevent accidental injury to the members of the crew, even though the ship and its appurtenances are ordinarily considered to be reasonably safe is thus recognized. A failure to exert such diligence as the circumstances require can result in either unseaworthiness (as found in the Mitchell [Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S. Ct. 926, 4 L.Ed.2d 941] & Tate cases, supra), actionable negligence under the Jones Act, or both.

"Here, the Court finds that the vessels involved were unseaworthy; and further, in respect to libellant's right to recover under the Jones Act, we find actionable negligence by respondent. Since the decisions of the Supreme Court in the cases of Rogers v. Missouri Pacific R. Company, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 and Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511, in 1957, it is clear that where the evidence leads the fact finder to the conclusion that the employer's negligence played any part, even the slightest, in producing the injury or death for which damages are sought, the employer's liability attaches and recovery may be had. (Benedict, Vol. 4, 1961 Supp. p. 57.)"

The District Court also found that Trahan was an experienced seaman and should have been fully cognizant of the danger involved in making the transfer. Trahan contends that since he was using the only method available in making the transfer, he could not have been contributorily negligent. This would be the correct rule only if in so doing, he had exercised reasonable care in the circumstances. His failure to request help from the Captain, or to attempt in any other way to minimize his own danger, the District Court felt, was the greater cause of his injury. Accordingly under the comparative negligence rule, Superior was held liable for only 25 per cent of Trahan's damages. In Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 204, 98 L.Ed. 143, 151 (1952), the Supreme Court said:

"The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice. Exercising its traditional discretion, admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires."

We agree with the trial court's conclusion that Trahan, an experienced hand who had been at sea on board vessels of the type involved, was guilty of contributory negligence in jumping from the heaving deck of the Supco V to the Rambio without requesting help from the Captain or the other crew members, who were aboard the Rambio; or in failing to attempt in any other manner to minimize his own danger. In the circumstances, his judgment should have dictated greater caution than his actions demonstrated.

Both Trahan and Superior object to the award of damages. It was established that Trahan was suffering from arthritis in his knees prior to the accident, but the medical reports indicate that this condition was seriously ag-gravated by the injury, precipitating the disability present at the time of trial. The physicians variously estimated his permanent partial disability in the lower extremities to be from 50 to 60 per cent; one physician stating, " * * * I very seriously doubt that he will be able to return to any arduous duties requiring use of the lower extremities." One medical opinion stated that if he performed his previous duties, he would not do so without symptoms such as weakness, instability of the legs, and pain. The court concluded that in all probability he will never be able to again work as a seaman. It is not contended that Trahan can never obtain any gainful occupation, but it is clear that his chances of obtaining employment as a laborer or as a seaman are substantially reduced and his ability to perform heavy work is diminished. In view of the expert testimony, we conclude that the trial court's findings as to damages are supported by substantial evidence; and are not clearly erroneous.

There remains the question of the validity of the purported release. The release purports to relinquish all claims by Trahan in admiralty against Associated Indemnity Corporation, insurer of Superior, for injuries received in the fall therein described as "both knees bruised". The Court found as a fact that there was no sufficient explanation of Trahan's rights in admiralty, under the General Maritime Law of Torts, the Jones Act, or for maintenance and cure; and while fraud is not suggested, the Court concluded that the respondent " * * * has completely failed to sustain the burden of proof that Trahan's rights were fully explained to him or that he had a full understanding and appreciation of the effect of his action in signing the document. He was clearly overreached." The applicable rule is laid down in Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239, 245 (1942) as follows:

"We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed

freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights."

We agree with the conclusion of the trial court. Norris, Law of Seamen, 2d Ed., Vol. 1, § 600 et seq.; Harmon v. United States, 5 Cir. 1932, 59 F.2d 372.

The judgment is affirmed.

CONNALLY, District Judge (concurring specially).

In the light of the obligation imposed upon the master of a vessel to use all reasonable care to protect and safeguard the members of his crew, I am of the view that the evidence is sufficient to support the findings of the trial court that the master was at fault in failing to take measures to protect the seaman who undertook to reboard his vessel. However, I find myself unable to agree with the majority that both of the vessels involved were unseaworthy, simply because the seaman undertook the foolhardy step of jumping from one to the other while both vessels were rocking wildly in a rough sea, and was injured in the process.

Both vessels were staunch, tight and true in all particulars. There was no glob of grease nor smear of slime or fish gurry involved here. There was no defect of a permanent or temporary nature. There is no reason to doubt that both vessels afforded safe means of boarding if secured alongside a dock, or the drilling platform. The basis for the holding is the general statement that there is a duty to afford a seaman a reasonably safe means of boarding and departing from the vessel. But this, like other generalities in the law, must be applied within reasonable limits.

These were small vessels, and as found by the trial court, not ordinarily equipped with bosun's chairs, gangways, and ladders; and the use of such appurtenances would have been impracticable. Had either vessel been equipped, as proctor for plaintiff suggests, with a boom and with swinging line or some similar Rube

Goldberg type device to transfer a seaman from one vessel to the other, I venture to say it would never have been used.

Both vessels and their appurtenances were, in my judgment, reasonably fit, and reasonably suitable for their intended service. If these vessels were unseaworthy because an injury of this type occurred, then it has become the duty of the ship owner to furnish an accident free ship. (Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941.)

I would concur in the affirmance on the negligence theory alone.