Buford TRAHAN

v.

SUPERIOR OIL COMPANY.

Civ. A. No. 8001.

United States District Court
W. D. Louisiana,
Opelousas Division.

April 3, 1962.

Hugh E. Brunson, Crowley, La., for plaintiff.

W. Ford Reese, Adams & Reese, New Orleans, La., for defendant.

PUTNAM, District Judge.

Libellant, Buford Trahan, filed this proceeding against his employer, Superior Oil Company, under the admiralty jurisdiction of the Court. The alleged accident occurred on March 31, 1959, offshore in the Gulf of Mexico where respondent is engaged in extensive operations for the discovery and production of oil, gas and related minerals. Libellant contends that as a result of the accident he is totally disabled and claims damages in the sum of $260,000.00. The case was tried to the Court.

## FINDINGS OF FACT

Buford Trahan is presently 28 years of age; he was in his 25th year at the time this injury occurred.

The facts developed at the trial reflect that the Rambio was moored to a piling on the lee side of a drilling platform or structure owned by respondent and identified as Structure 9, off the Louisiana Coast in the region of Cameron Parish. Another vessel, a tug, also owned and operated by respondent called the Supco 5, was moored to another piling approximately 20 feet distant. Both boats were secured by the bow line only, bow on to the sea and facing the drilling platform; the Rambio was "port side to" to the Supco 5. By the ordinary action of wind, sea and current, there was some swinging of the vessels so that from time to time they were together, separated only by the tire casings used on the boats as fenders. There were no lines between them to keep them in a fixed position in relation to each other.

The Rambio is approximately 65 feet long, while the tug Supco 5 is approximately 80 feet in length. Because of this difference and the way the boats were moored, the bow of the Supco 5 was located at or just aft of the midship's section of the Rambio, and the sea, which the witnesses indicate was running between five and seven feet at the time of the accident, caused the two boats to pitch. They did not pitch in unison; while the Rambio was going down at the bow and up at the stern, the Supco 5 would go up at the bow and down at the stern, and during this motion the decks of the two vessels reached a position at which they were even or level with each other.

At about five o'clock in the afternoon of March 31, 1959, Trahan and another member of the crew of the Rambio, Herbert Kibodeaux, went aboard the Supco 5. At this time, the sea was moderate, running up to three feet in height. The master of the Rambio, Alex Connor, remained on board of that vessel; Connor had full knowledge of the fact that the men were going aboard the tug, made no objection thereto and in fact testified that he had none. The two men were in a stand by duty status and went aboard Supco 5 merely for a visit. This was not

unusual, the evidence preponderates to the effect that this was customary when two of respondent's boats tied up together under similar circumstances.

The men transferred from the Rambio to the tug by the simple expedient of waiting for them to swing together and stepping or jumping from one vessel to the other, when the decks reached a level or near-level position.

Later in the afternoon the Supco 5 received orders requiring her to leave Structure 9. Trahan and Kibodeaux left to return to the Rambio; the sea was heavier and more "choppy" than it had been when they left their ship, Captain Connor's testimony being that the waves then were five to six feet high. Kibodeaux went aboard the Rambio first. In making this transfer he stepped to the top of the bulwark on the tug, waited for the deck of the Rambio to rise, then stepped or jumped onto the latter vessel.

Trahan, in attempting to follow, did the same thing, but as he jumped the Rambio was falling away, that is to say it was dropping while the Supco 5 was rising. When he landed on the deck of the Rambio, between the after bit and the airvent shown in exhibit "Superior 5", on her port side, he fell on his knees, then tumbled over into the cockpit. This cockpit is about 20″ deep and is inboard of the deck at the point where Trahan jumped.

Kibodeaux attempted to catch and steady him but missed. Captain Connor was standing on the port side of the Rambio near the forward part of the cabin, and saw the men coming back aboard. He watched them make the transfer and did not caution them, order a line passed between the two vessels to hold them steady, nor did he go aft to lend assistance, stating that he simply did not think these precautions were necessary. He knew at the time that they would transfer in this manner and that it was, in fact, the only means of making the transfer.

While the top of the bulwark on the Supco 5 was about 5 inches in width, the top of the bulwark around the stern of the Rambio was only one inch in width, so that the men had to jump or step over this bulwark, to the deck outboard of the cockpit space, which was about twenty-four inches in width. Photographs of the two boats introduced into evidence, would indicate that the bow of Supco 5 is approximately a foot or eighteen inches higher than the after deck of the Rambio at the point where libellant jumped. The Rambio was falling away or descending and the vessels were separated by the swinging action by about two feet (testimony of Trahan was that they were from 1 to 3 feet apart), so that Trahan had to clear the open water, the bulwark or rail of the Rambio, and land on the deck space inboard of the bulwark, at the same time dropping a distance of from two to three feet in height.

All of the testimony in the case is to the effect that this was the usual and customary means of transferring from one vessel to the other on such occasions, even while boats of this type are at sea. Libellant had worked aboard the Supco 5 before going aboard the Rambio for duty, and hence was thoroughly familiar with the construction and actions of both vessels. He stated that he thought a bosun's chair could have been rigged from the tug to the crewboat, or another davit installed on the port side of the Rambio from which a line could have been suspended to permit the men to steady themselves when transferring, but the fact is he had never seen this done on either vessel and the davit he proposed to install was not there. Moreover, as Captain Connor pointed out, a davit or opening in the bulwark would be impractical for such purposes, as it would require the two vessels to be in exact position each time a transfer was made, without taking into account variations in height, freeboard, length, and other details of construction.

After his fall, Trahan testified that his knees hurt him considerably and that Kibodeaux helped him to the cabin. According to him, he remained inactive the remainder of that night. Both knees

became swollen, and when he got into port he went to see Dr. Carpenter. Thereafter he continued to work but his knees kept giving him trouble. He had no strength in them, could not climb ladders unless he had something to hold on to and he could not load anything.

Captain Connor, on the other hand, maintains that he saw nothing to indicate to him that Trahan needed medical attention, and that he did not complain to him about his injuries.

Suffice it to say that the evidence shows conclusively in the opinion of the Court that this man fell as he says he did, and that he injured his knees in this fall, finally resulting in removal of both kneecaps and his present condition of disability. The extent of his disability and the pre-existing arthritic condition from which he suffered will be discussed hereinafter.

## ISSUES PRESENTED

Libellant cumulates three causes of action, (1) his claim as a seaman for maintenance and cure, (2) his claim for indemnity and medical expenses for negligence under the Jones Act, (46 U.S.C.A. § 688), and (3) his claim for indemnity and medical expenses for unseaworthiness based upon failure to provide a reasonably safe place to work (no means of ingress or egress), and incompetence of the master and crew of the Rambio.

Respondent pleads a general denial, that Trahan was on a private mission, not in the service of the ship, at the time the accident happened, and in addition, urges a release of claims by libellant which is in evidence identified as "Superior 11"; alternatively, that the contributory negligence of Trahan was so gross and palpable as to reduce recovery to a minimum.

## THE RELEASE

■ The instrument relied upon as a release by respondent is dated June 1, 1959. In it, Trahan purports to relinquish all claims in Admiralty against Associated Indemnity Corporation, insurer of Superior Oil Company, for injuries received by him in this fall, (described in the release as "Both knees bruised"), and to accept in lieu thereof the benefits of the Louisiana Workmen's Compensation Law.

Respondent does not rely heavily upon this release. The evidence presented at the trial consisted of the testimony of one of the witnesses subscribing to the document, Willie Miller, Mr. Hebert, who was present when Miller spoke to libellant about it, and cross examination of the libellant. There is no doubt that there was no explanation of Trahan's rights in Admiralty, under the general maritime law in tort, the Jones Act, or for maintenance and cure, and while there is no showing or even suggestion of fraud, respondent has completely failed to sustain the burden of proof that Trahan's rights were fully explained to him or that he had a full understanding and appreciation of the effect of his action in signing the document. He was clearly overreached. See Norris, Law of Seamen, 1951, Vol. 1, Sec. 499 et seq., Garrett v. Moore-McCormack Company, (1942), 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, Harmon v. United States, 59 F.2d 372 (5th Cir. 1932).

We, therefore, hold the release in the instant matter to be invalid and without effect.

## CONCLUSIONS OF LAW

Libellant takes the position that the liability of respondent is fixed by virtue of the fact that no safe means of ingress and egress to and from the Rambio was provided, a condition which he argues constitutes both unseaworthiness and actionable negligence, either or both of which is sufficient to sustain his suit, as the accident and his resulting injuries were proximately caused thereby. He cites and relies upon Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Smith v. United States, D.C., 121 F.Supp. 778 (1953); Buch v. United States, 122 F.Supp. 25 (1954); Wheeler v. West India S. S. Co., 103 F.Supp. 631 (1951); Casbon v. Stockard S. S. Corp., D.C., 173 F.Supp.

845 (1959); Sroki v. Koch-Ellis Marine Contractors, Inc., D.C., 151 F.Supp. 559; and Larsen v. United States, D.C., 72 F. Supp. 137 (1947).

All of the cited cases involved either an unsafe condition in the means of ingress and egress or a defective appliance furnished the libellant in his work. In Miller, libellant slipped and fell as a result of fish gurry and slime which had been allowed to remain on the ship's rail, customarily used as a step to reach a ladder leading to the dock when the trawler was moored; here the Court laid the ghost of the distinction theretofore made between "transitory" or temporary conditions resulting in unseaworthiness, and those resulting from defects in the construction of the vessel or its appurtenances arising during the course of the voyage, and held the shipowner's duty to be absolute in all cases, applying the doctrine of liability without fault for injuries resulting therefrom; in Smith, a carpenter's ladder improperly lashed to the ship's rail broke; in Buch, the ship's ladder did not reach to the deck of a coal barge alongside, which was wet and slippery from coal dust, causing the injuries; in Casbon, a stevedore was injured when defective scaffolding furnished him by the owner's agent collapsed; in Larsen a gangway furnished by the shipyard with a railing on one side only was held to be unsafe. The Wheeler and Sroki cases are distinguishable and are not apposite here.

Respondent relies primarily upon Meintsma v. United States, 9 Cir., 164 F.2d 976 (1947) and Jackson v. Pittsburg S. S. Co., 6 Cir., 131 F.2d 668 (1942), and the general principle that the owner must see that the ship is in a fit state as to repairs and equipment, in respect to seaworthiness, 79 C.J.S. Seaman § 192, p. 679; and that as to negligence under the Jones Act, the owner is not bound to furnish an accident-proof ship, but is bound only to exercise reasonable care to see that the ship and its appurtenances are reasonably safe. 79 C.J.S. Seaman § 192, pp. 681–683.

The Meintsma and Jackson cases do not, in our opinion, apply to the situation found here. In each, the crew member was held to be acting in the pursuit of his personal affairs thereby bringing about an intervening cause. See Tate v. C. G. Willis, Inc., D.C., 154 F.Supp. 402, 407, (1957), explaining the Jackson case. In Tate, the deceased seaman was returning to his ship after liberty and died as a result of injuries which the Court found resulted from an unsafe means of ingress and egress from the ship. Here, Trahan was returning to the Rambio after an absence aboard Supco 5 while in a stand by status and pursuant to a custom authorized and recognized by respondent's small vessels engaged in offshore work. We find the following observations of the Court in the Tate case to be especially pertinent here:

> "While it cannot be said that respondent, in failing to furnish any physical means to get to the dock, is per se negligent, stepping from the barge to the dock and from the dock to the barge in total darkness *is an obvious unsafe condition which could be remedied* by providing sufficient lighting facilities in the locality in which it was anticipated that the various crew members would endeavor to go ashore. *The duty to provide a seaworthy vessel encompassed the affording a seaman a reasonably safe means of boarding and departing from the vessel.*" (154 F.Supp. 402, 406. Emphasis added).

The duty of the owner to take affirmative action when prevailing conditions require such to prevent accidental injury to the members of the crew, even though the ship and its appurtenances are ordinarily considered to be reasonably safe is thus recognized. A failure to exert such diligence as the circumstances require can result in either unseaworthiness (as found in the Mitchell & Tate cases, supra), actionable negligence under the Jones Act, or both.

Here, the Court finds that the vessels involved were unseaworthy; and

further, in respect to libellant's right to recover under the Jones Act, we find actionable negligence by respondent. Since the decisions of the Supreme Court in the cases of Rogers v. Missouri Pacific R. Company, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 and Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511, in 1957, it is clear that where the evidence leads the fact finder to the conclusion that the employer's negligence played any part, even the slightest, in producing the injury or death for which damages are sought, the employer's liability attaches and recovery may be had. (Benedict, Vol. 4, 1961 Supp. p. 57.)

That Trahan was within the meaning of the term "in the course of his employment" as the phrase is used in the Jones Act is manifest. (For an exhaustive discussion of this question see annotation appearing in 4 L.Ed.2d 1777.)

The vessels in this case were in reality small craft. As such, they are not ordinarily equipped with ships ladders, gangways, bosun's chairs and like appurtenances because of the impracticality of their use. The testimony of all parties is to the effect that the ordinary and accepted method of transferring from one vessel to the other is by stepping from ship to ship. But, as was aptly observed in Casbon v. Stockard S. S. Corp., supra, long accepted practice which is unsafe (or may become unsafe in the light of surrounding circumstances) does not alter or change respondent's position as to liability under the law. Nor can such practice be regarded as lessening the duty of the shipowner to take affirmative action to prevent accidental injuries to members of the crew when ordinary care indicates the necessity therefor.

Alex Connor, skipper of the Rambio, testified that the boats were pitching in choppy seas running from 5 to 6 feet high. He was present and watched Trahan and his companion coming aboard, and was fully cognizant of the swinging action of the vessels which caused them to separate and come together. He could have done three things to minimize the apparent danger in coming aboard the Rambio, first, slacking off the bow line to permit the vessel to drift back from the platform until its pitching motion was more evenly synchronized with that of Supco 5, and, secondly, passing a line from one boat to the other to hold them together during the transfer. Neither of these operations would have required any great effort, and, he being the representative of respondent aboard the vessel and in charge of the safety and welfare of the crew, was under a duty to so act. Thirdly, he could have offered a steadying hand to the men coming aboard. Any of these three things would have rendered the means of ingress or egress available to Trahan more safe, and lessened the danger attendant upon returning to his ship by the only means provided, and the failure to so act proximately caused this mishap.

Gwinett v. Albatross S. S. Co., Inc., 243 F.2d 8, (2nd Cir. 1957), recognizes the rule that in cases arising under the Jones Act, negligence should be based on the foreseeability of harm, and respondent's conduct should be measured by what a reasonably prudent man would do.

Applying these tests to the facts of the case at bar, the Court has no hesitancy in concluding that respondent was guilty of negligence in permitting libellant and his co-worker to attempt the transfer back to the Rambio in the manner outlined above, and that such negligence consisted specifically in failing to provide a reasonably safe means of ingress and egress to and from its vessel. This negligence was a proximate cause of the accident and Trahan's resulting injuries. To hold otherwise would, in the opinion of the Court, be to completely ignore the danger attached to the operation of "jumping" from one ship to the other, and confess complete ignorance of the action of wind and waves on small vessels such as these. Justice is blind, but such blindness does not include a state of insensibility to that which is so obvious.

Since the means furnished in leaving and returning to the Rambio were not

reasonably safe, this condition amounts to unseaworthiness under the jurisprudence cited as well.

### QUANTUM

The medical evidence in the case consists of the written reports of the doctors who examined and treated Trahan, and one physician (Dr. Hatchette) who examined him prior to the trial and evaluated his condition. It is established that he was suffering from arthritis in his knees prior to the accident which resulted in swelling of the joints and pain at intervals of every three or four months. The fall which he sustained resulted in swelling of the knees and pain; after extended treatment and repeated examinations it was concluded that the patella or kneecap should be removed from both knees. The first operation, performed on the right knee, occurred on January 9, 1960, the second on April 5, 1960, with Dr. Campbell, an orthopedist of Lake Charles, who had treated Trahan since April 13, 1959, attending. Removal of the kneecaps was dictated by the condition found to exist in this man's kneecaps and which preexisted the accident; the total effect of all of the medical reports, however, indicates that the condition was aggravated by the injury of March 31, 1959, thus precipitating the condition of disability in which Trahan now finds himself. The requirements of proximate causation and result are, therefore, met.

Libellant was discharged from further treatment on April 27, 1961, by Dr. Campbell, who evaluated his status as a permanent partial disability of 30% of each leg, a total of 60% disability in the lower extremities. At that time the doctor was of the opinion that he could perform his previous duties, but not without symptoms, such being pain, weakness and instability of the legs.

After examination Dr. Hatchette considers Trahan to be permanently disabled to the extent of 25% of each leg, or a total 50% permanent disability of the lower extremities. He concludes his report ("Trahan 3"), by saying "—I very

seriously doubt that he will be able to return to any arduous duties requiring use of the lower extremities."

Considering the nature of libellant's work, the Court concludes that he is not now and in all probability never will be able to do work as a seaman.

At the time of the accident Trahan was earning $460.00 per month and was 25 years of age. Some two years and eleven months elapsed from date of the accident to the time of trial, during which period his loss in wages he would have earned amounted to $16,100.00. He is also entitled to an award for pain and suffering endured by him and for loss or diminution of earning capacity, if any. While his condition at the time of and following the accident was not especially painful, we have seen that it persisted for over a year and finally resulted in two operations, each of which was painful, and that his knees, even at the time of trial, continue to pain him. According to his attending physician, the knees will remain unstable, weak and somewhat painful for some time in the future, which is not fixed with any degree of exactness. It is difficult to evaluate pain and suffering, but from the facts here, this Court finds and will award Trahan the sum of $20,000.00 therefor.

Next for consideration is the diminution of his earning capacity because of the permanent residual disability in his lower extremities, fixed by Dr. Hatchette at 50%, and by Dr. Campbell at 60%. Libellant is a young man, with a life expectancy of approximately 36 years. Prior to his injuries, he had worked as a farmer-laborer, and finally as a seaman. He has a seventh grade education.

The Court does not feel that he will never be able to resume any gainful occupation. There is no question, however, but that his chances of obtaining employment as a laborer or seaman are greatly lessened, and his ability to perform heavy labor is also diminished. Based upon life expectancy and his salary rate of $460.00 per month, earned at the time of his injury, discounted at 5% per an-

num, his loss of wages for total incapacity would amount to approximately $92,000.00. This is not a fair estimate of his damage here, however, and I find it should be reduced by 50% to the sum of $46,000.00.

Total award of $82,000.00 for all of Trahan's damages herein is therefore made.

All medical expenses have been paid by respondent.

### COMPARATIVE NEGLIGENCE

■ The amount of damages which Trahan suffered must be reduced in the proportion that his own fault contributed to the happening of the accident. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

■ Respondent argues that libellant's contributory negligence was so great as to reduce the award in this case to a minimum. That he was guilty of negligence which contributed as a proximate cause of the accident and his injuries is manifest. He was an experienced hand, had been at sea on board vessels of the type involved here, and was, or should have been, fully cognizant of the dangers encountered in jumping from the heaving deck of the Supco 5 to the deck of the Rambio. He made no request for help from either Kibodeaux or Connor, did not ask for a line to be passed between the vessels to keep them together, or attempt in any way to minimize his own danger. Under these circumstances the Court feels that his own error in judgment was by far the greater cause of his loss.

I find that Trahan was negligent in jumping from one boat to the other as he did in this case, and that his fault contributed to the accident to the extent of 75%. The respondent will therefore be liable only for 25% of the damages suffered by libellant, or a total of $20,525.00.

### MAINTENANCE & CARE

The parties have stipulated that maintenance in this case should be fixed at $6.00 per day. From March 31, 1959 to April 27, 1961, the date fixed by Dr. Campbell when Trahan was discharged from further treatment, this amounts to the total sum of $4542.00. From this amount must be deducted the sum of $1,450.00 paid by respondent to him during the course of his treatment and operations, over and above medical expenses. The sum of $3,092.00 should be added to the above award, with interest at the legal rate of 5% per annum from date of decree until paid.

Counsel for libellant will file suggested findings of fact and conclusions of law herein within ten days. Counsel for respondent shall have ten days after receipt of a copy thereof to file any suggested changes therein, after which a formal decree will be entered.