Alvin E. **DAVIS**

v.

**ASSOCIATED PIPE LINE CONTRACTORS, INC.**, Travelers Insurance Company,

and

J. Ray McDermott & Company, Inc., **OFFSHORE CREWBOATS, INC.**, Third-Party Defendant.

Civ. No. 12768.

United States District Court W. D. Louisiana, Lake Charles Division.

June 20, 1968.

Supplemental Opinion Dec. 4, 1968.

William B. Baggett, Lake Charles, La., for plaintiff.

Edmund E. Woodley, Holt & Woodley, Lake Charles, La., for defendants.

Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for third party defendant.

EDWIN F. HUNTER, Jr., District Judge:

Petitioner cumulates three causes of action against his employer, Associated Pipe Line: (1) under the Jones Act, 46 U.S.C.A. § 688 for personal injuries allegedly sustained; (2) under General Maritime Law because of the alleged unseaworthiness of Derrick Barge No. 12 for the same injuries; and (3) under General Maritime Law for maintenance and cure. Joined also as a defendant under the Maritime law is J. Ray McDermott Company, the owner of the barge.

Defendants answered the suit, denying both negligence and unseaworthiness, and in addition filed a third party demand against Offshore Crewboats, Inc., alleging on information and belief that the plaintiff was injured while boarding the crewboat AILINE ELIZABETH II; and that his injuries, if any, resulted from the unskillful handling of the crewboat in violation of the express obligation in the charter agreement to furnish a competent crew. Shortly before trial (less than ten days before) counsel for defendants amended their third party demand to plead that plaintiff was injured while boarding the ALICIA VICTORIA or the PARAMOUNT, crewboats owned by Offshore, Inc. Concededly, this turn of events presented a new problem as between defendants and third party defendant. Consequently, we severed the third party demand as to the issues raised by this amendment.

Counsel for third party defendant was certainly correct in his contention that this involved new issues and he was entitled to the usual legal delays. The case proceeded to trial as between plaintiff and defendants and the third party defendant only insofar as AILINE ELIZABETH II. This action was without prejudice to defendants' right to be afforded an opportunity to prove that the ALICIA VICTORIA and/or the PARAMOUNT were involved. However, this contest between defendants is not to delay the final determination between plaintiff and defendants. This case had been set for many months and plaintiff should not be delayed because of later developments between defendants.

The trial began on March 5, 1968. It was concluded on March 14, 1968. Everything is in dispute. All issues were vigorously contested. Defendants obviously doubt that Mr. Davis was hurt on the job. We make findings and state conclusions:

### FINDINGS OF FACT

1. Alvin E. Davis is a resident of Calcasieu Parish, Louisiana. Associated Pipe and J. Ray McDermott are foreign corporations authorized to do and doing business in the State of Louisiana.

2. At all times pertinent J. Ray McDermott was the owner and operator of Drilling Barge 12, a 500-ton capacity water crane barge, 400 feet long, 100 feet wide, with a depth of 28 feet.

3. At all times pertinent, Derrick Barge 12 was located some fifty miles South of Leeville, Louisiana, on the Continental Shelf, and was engaged in laying a 22″ pipe line for Gulf Oil Corporation.

4. At all times pertinent Associated Pipe was a subcontractor furnishing a part of the skilled labor in the said pipe laying work.

5. Derrick Barge 12 was a vessel within the contemplation of the Jones Act and Alvin E. Davis was a member of the crew of that vessel within the meaning of the Jones Act.

6. On June 9, 1966, Alvin E. Davis was employed aboard Derrick Barge 12 as a fork-lift operator. His immediate employer was Associated Pipe.

7. On June 9, 1966, Davis and some 79 other employees of Associated Pipe were leaving the barge to return to shore, pending equipment repairs.

8. These employees of Associated Pipe were disembarking from Derrick Barge 12 into a crewboat which would take them to shore.

9. At least three crewboats were in use for this purpose. Two had already received a capacity number of passengers and departed. Alvin E. Davis was the last employee to get into the last crewboat.

10. We do not know the name of the crewboat nor the owner of it. The case as between the defendants and the third party defendant is to remain open if either party wishes it so. We would like to resolve the identity of the crewboat involved.

11. The means of transferral utilized by Alvin E. Davis and the other Associated Pipe employees was ladders made of rubber truck tires strung on steel cables which were mounted at intervals on the barge between wooden fenders made of 12″ x 12″ timbers. The truck tires were of various sizes. They were hung in irregular and various heights from the water line.

12. Derrick Barge No. 12, at the time of the accident (June 9, 1966) was not equipped with any other type ladder or appliance to assist the crew members in getting off the barge except for these rubber truck tires.

13. At all pertinent times the crewboat on which plaintiff departed came alongside on the windward side of the derrick barge. There were five to seven-foot seas and five to six-foot ground swells. Good seamanship dictated that the crewboat should have come alongside on the leeward side. Plaintiff descended on the rubber tires and was standing on the second tire from the top when suddenly the bottom tire in the

string and the tire on which plaintiff stood was picked up 1½′ to 2′ by the bobbing crewboat. When the crewboat "dropped," plaintiff was jarred, and in the process twisted and injured his back.

14. At the time the tire was struck by the crewboat, the crewboat stern had drifted out at an angle of approximately 45° from the side of the barge, and the plaintiff was attempting to board the crewboat approximately ten feet back from the bow.

15. The selection of a safe berth is in general the responsibility of the crewboat operator, but the barge captain did have the final say.

16. All witnesses emphasized that transferral in open sea is an extremely hazardous undertaking. This 500-ton capacity derrick barge is one of approximately six in the entire world of its size. The Court feels that there is just no safe way to transfer personnel from it to a small crewboat in heavy seas under the total circumstances.

■ 17. The transferral operation as it related to Davis did not afford him a reasonably safe means of departing from the barge and resulted in both unseaworthiness as found in Tate v. C. G. Willis, Inc., D. C., 154 F.Supp. 402, and actionable negligence under the Jones Act. Trahan v. Superior Oil Co., D.C., 204 F. Supp. 627. This negligence and/or unseaworthiness consisted of a combination of factors, namely:

(1) Bringing the crewboat along the windward side of the barge.

(2) Permitting Davis to begin his descent when the stern of the crewboat had drifted out.

(3) Permitting Davis to begin his descent as the bow was "bobbing up and down" and striking the tire.

(4) The practice of using fenders or bumpers made of truck tires as a ladder under these circumstances as the only means of disembarking was an unsafe practice.

(5) There was no reasonable safe means of disembarking from Barge No. 12 furnished to Davis at the pertinent time.

■ 18. The defendants are constantly trying to improve the safety of their operations at sea and are to be commended. We find also that at the time of this accident they seriously believed that the method of transfer which was being used was the best, and that it was customary in the trade. However, we do point out that what is customary is evidence of due care—here, the reasonable fitness element on the concept of seaworthiness—but merely because something is customary is not the legal measure of the duty to furnish a seaworthy. June T, Inc. v. King, (5 Cir., 1961) 290 F.2d 404.

■■ 19. As for the crewboat, we we feel that the operator of the crewboat was negligent. We do not know its idenity or its owner. However, the obligation of Associated Pipe and McDermott to Davis remains. They were obligated to furnish him a safe method of ingress and egress. They did not do so. The failure to do so was a proximate cause of his injury. Associated Pipe and McDermott cannot contract away this obligation.

■ 20. Defendant argues that Davis's contributory negligence was so great as to reduce the award in this case to a minimum. In view of the fact that some 79 men preceded Davis without incident, we should examine the actions of plaintiff closely. Plaintiff testified that when he got ready to get on the boat the stern had drifted away, and in relation to the barge was lying at a 45° angle. He then attempted to get on the crewboat at the angle of the bow. The stern line had been released. He was the only one to get on the crewboat after it had been released. Most of the witnesses were of the opinion that if the boat was properly tied up—that is, against the barge—the tires would not be lifted, and that the proper way to board a crewboat is from the stern. Mr. Davis was an experienced man. He was fully cognizant of the danger involved in making the transfer. He argues that he was using the only method

available in making the transfer and therefore should not be held contributorily negligent. This would be cogent only if in so doing he had exercised reasonable care. His failure to request help from the captain of the crewboat or the barge personnel or to call attention in any other way to minimize his own danger was, in our opinion, a proximate cause of his injury. See Trahan v. Superior Oil Company, D.C., 204 F.Supp. 627, affirmed Fifth Circuit, 322 F.2d 234, 8 A.L.R.3d 497, and the discussion there concerning the comparative negligence ruling. In *Trahan* it was held that the plaintiff's fault had contributed to the extent of 75%. We do not believe that the plaintiff's negligence in this case contributed to that degree. We find that Davis was negligent and that his fault contributed to the extent of 33⅓%. Defendants will therefore be liable for only 66⅔rds per cent of the tort damage suffered by Davis.

## QUANTUM

1. The injury occurred on June 9, 1966. Davis returned to work on June 15th. He says that the last day worked was on July 17, 1966. We accept this and find that Davis last worked for Associated Pipe on July 17, 1966. He has not worked since except for five days in 1967. This was for another company.

2. He first went to see Dr. Morris, a general practitioner of Lake Charles, Louisiana. This was on or about July 6, 1966. Dr. Morris prescribed medication but this did not help. Subsequently, Davis went to a chiropractor for treatment. He received no relief from that source.

3. His "back got so bad" that he consulted Dr. White, a general practitioner of Lake Charles. Dr. White had him admitted to St. Patrick's Hospital on July 19th. Drs. Phillips and Campbell, Lake Charles Orthopedists, were "called in" for consultation purposes. He remained at St. Patrick's for eleven days. Dr. White's diagnosis was made on July 19, 1966: "acute lumbo sacral strain—possible ruptured disc." Dr. Phillips made a

diagnosis on July 26, 1966 of a "protruding lumbar disc."

4. On or about September 9, 1966, Davis was referred to Dr. M. E. Faulk, a Neurosurgeon of Beaumont, Texas. A myelogram was made which revealed a defect between L5 and S1 on the right side. On September 21st Dr. Faulk performed surgery and removed a herniated disc at L5 and S1 on the right side. Davis was discharged from the hospital on October 3rd. Dr. Faulk believes that the post-operative recovery was fairly good. He continued to see this gentleman, Mr. Davis, and last saw him in November of 1967. At that time Dr. Faulk was of the opinion that maximum recovery has been attained.

5. Dr. Faulk has expressed what later develops to be the opinion of most of the doctors—namely, that Mr. Davis's need is for improvement in his general anxiety condition. He stated that there was just no sign of any neurological damage. He assessed the patient's major problem to be tension and suspected that this would resolve itself after "settlement of all this business." As early as March of 1967, Dr. Faulk thought Davis could return to work but avoid heavy or prolonged lifting. This was reiterated on the date of his deposition on January 17, 1968. To quote again from Dr. Faulk's testimony: "One thing I find with these people that are excessively worried is, of course, any time they go back and start doing something they do a little more than they should, they get a little bit sore as you and I would if we went out and did something we hadn't been doing. This discourages them and they give up." He thought the symptoms would gradually resolve if he returned to work. Dr. Faulk added: "He is worried about his back and he's got a suit going on, and all these things, I'm sure, contributed to the tensions."

6. Dr. Robertson is a Neurologist of Houston, Texas. He examined Mr. Davis on August 30, 1967. A neurological examination failed to reveal any abnormality in the muscle volume, muscle tone,

or strength in the muscles of the legs, thighs or feet. It also revealed that Davis could walk on his heels and his toes without difficulty and that his reflexes are present and equal with minimum diminution of the right tendon achilles reflex. Dr. Robertson found a painful fatty nodule, superficial to the right sacroiliac joint but did not connect this in any way with the accident. He also found "an anxiety state," and recommended repeat myelography and also electro myelogram. To carry out these recommendations, Davis was sent to Methodist Hospital on or about October 15, 1967. An examination followed and showed only changes which were reasonably explainable by the previous surgery. Davis was discharged from Methodist on October 19th and saw Dr. Robertson again on December 8th. Dr. Robertson says that Davis told him that sometimes he, Davis, thought he was getting completely well, and then he would revert to the previous pain which dates about two months following his low back surgery. Davis had meanwhile discontinued the prescribed exercises because he felt this made his condition worse. The electro myelogram was also normal. Dr. Robertson's conclusion was that this man was disabled because "I don't believe you would ever get him back to the job, and secondly, if you would, I don't believe he would stay because his complaints would become worse." He found the complaints out of proportion with the findings—that is, they were just not substantiated by what Dr. Robertson found. He believed that Davis had reached maximum recovery by December 8, 1967, but that he does have some disability, orthopedic-wise, which is made worse by a functional instability. His advice to Mr. Davis is "we can't find anything wrong with you except what we have told you, but if you want us to go back and re-explore, we will.: Ninety-four percent of the people who have had this operation which Mr. Davis had are able to return to their usual work with an average disability of about 15%. We quote again from Dr. Robertson: "I can't recommend surgery on this man with any enthusiasm because I have no neurological or physical objective findings." Once again, Robertson reiterates the man's anxiety state is a cloud which he finds difficult to penetrate: "Everything about this fellow is 'iffy'."

7. Dr. Brownhill is an orthopedist practicing in Houston, Texas. He examined Mr. Davis on October 17, 1967 at the request of Dr. Robertson. The examination was carried out at the Methodist Hospital in Houston. Dr. Brownhill saw him for evaluation and diagnostic purposes. He found no detectable muscle weakness or atrophy. X-ray studies revealed no residual. They revealed nothing that was not normal, but did show the previous laminectomy defect. Dr. Brownhill opined that the chief difficulty is just a post-operative problem, intervertebral, and that the best thing for him to do was to take prescribed exercises. Dr. Brownhill does not believe that Davis can do work that involves extreme motion of the spine and that his disability to this extent was more or less permanent. He did not believe that operative intervention in the form of a re-exploration and/or spinal fusion was indicated.

## MAINTENANCE AND CURE

1. There is considerable evidence that plaintiff reached maximum cure in November of 1967; but we believe it more realistic to find that he reached maximum cure on December 18, 1967. We do so find.

2. Davis is entitled to $8.00 per day as maintenance from July 18, 1966 until December 18, 1967, or a total of 518 days totalling the sum of $4,144.00.

3. He has received $4,475 as compensation payments from his employer. This is to be offset against the $4,144. Thus no further maintenance is owed, and Associated Pipe Line is due a credit of $331.00.

4. Plaintiff was also entitled to be compensated on a 100% basis for medical expenses until he reached maxi-

mum cure. This, like maintenance, is not to be reduced because of contributory negligence. These expenses, as best I can ascertain from the record, amounted to $3,233.18, and have been paid.

5. We do not hold that Davis can never obtain any gainful occupation. The consensus of medical opinion is that his major difficulty may be functional, but it is clear that his chances of obtaining employment as a heavy laborer or seaman are lessened and his ability to perform heavy labor is greatly diminished.

■■ 6. The award of damages for personal injuries is of necessity somewhat arbitrary and varies greatly with the facts and circumstances of each case. In trying to assess the amount of future loss of earnings as well as probable future pain and suffering, the totality of circumstances must be considered. After a careful consideration of all the factors involved in this case, most of which have been enumerated, it is concluded that plaintiff has been damaged in the sum of $45,000 for all elements of damage resulting from this accident (save and except those items connected with maintenance and cure). This sum of $45,000 includes (1) loss of past wages, (2) future medical expenses, (3) present, past and future pain and suffering, and (4) any and all other damage of any kind resulting from this accident. Having found Davis contributorily negligent to the extent of 33⅓%, defendants are liable under this finding for $30,000.

Summarizing:

| | |
|---|---|
| Maintenance and Cure | $ 7,708.18 |
| Other damage (see 5, supra) | 45,000.00 |
| | $52,708.18 |

7. The maintenance and cure has been paid. The $45,000 must be reduced by one-third, leaving a total recovery of $30,000, with interest thereon from date of judicial demand until paid.[1]

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter under the Jones Act and under its general maritime jurisdiction. Venue is properly laid in the Western District of Louisiana.

■■ 2. It has been settled law since The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, was decided—that the vessel and its owner and operator are liable to indemnify a seaman for injuries caused by unseaworthiness of the vessel or its appliances and equipment. Mahnich v. Southern SS Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

■■ 3. The duty to provide a seaworthy vessel encompasses the affording to a seaman of a reasonably safe means of boarding and departing from the vessel. Trahan v. Superior Oil Co., 204 F. Supp. 627, aff'd Superior Oil Co. v. Trahan, 5th Circuit, 322 F.2d 234.

■■ 4. This duty to provide a seaman a seaworthy vessel and a safe place to work (including means of ingress and egress to and from the vessel) is an obligation of the owner of the vessel to the employee of an independent contractor and is also an obligation of the seaman's employer. The owner (McDermott) and the employer (Associated Pipe Line) are liable in solido for a breach of that obligation.

■■ 5. The amount of damage which Davis sustained must be reduced in the proportion that his own fault contributed to the happening of the accident. The maintenance and cure awards are not to be and have not been so reduced.

There should be judgment in accordance with these findings and conclusions. There is.

## SUPPLEMENTAL OPINION

The Court has for disposition:

1. Plaintiff's motion to amend Findings of Fact and Judgment;

---

1. Associated Pipe Line is due a credit of $121.

2. Defendants' motion for a new trial;

3. Third party plaintiff's action for indemnification.

## MOTIONS BY PLAINTIFF AND DEFENDANTS

On June 20, 1968 this Court set forth in writing explicit findings and conclusions as to the claims between plaintiff and defendants. We have reviewed the record and upon the basis of that record reiterate our findings and conclusions. The plaintiff's motion to amend the findings is denied. Defendants' motion for a new trial is denied.

## THE THIRD PARTY CLAIM

The original cause of action here joined as parties defendant J. Ray McDermott Company, the owner of the barge, and Associated Pipeline Company, the employer of plaintiff. Defendants answered the suit, and in addition, filed a third party demand against Offshore Crewboats, Inc., alleging on information and belief that the plaintiff was injured while boarding the crewboat, AILINE ELIZABETH II, and that his injuries, if any, resulted from the unskillful handling of the crewboat in violation of the express obligation in the charter agreement to furnish a competent crew. Less than ten days before trial, defendants amended their third party demand to plead that plaintiff was injured while boarding the ALICIA VICTORIA or the PARAMOUNT, or some other crewboat owned by Offshore, Inc. Concededly, this turn of events presented a new problem as between defendants and third party defendant. Consequently, the third party demand as to the issues raised by the amendment were severed from the original action. The case proceeded to trial as between plaintiff and defendants and the third party defendant only insofar as the AILINE ELIZABETH II was concerned. This action was without prejudice to defendants' right to be afforded an opportunity to prove that the ALICIA VICTORIA and the PARAMOUNT and/or some other crewboat owned and operated by Offshore was involved.

In its findings with respect to the original pleadings the Court entered a verdict in favor of the plaintiff, holding defendants liable on the grounds that Drilling Barge 12 was unseaworthy; that both the original defendants were guilty of negligence; and that the plaintiff was not provided a safe place within which to work. The Court also granted summary judgment in favor of the third party defendant, Offshore Crewboats, with respect to its C–B AILINE ELIZABETH. The case was set down for further hearing as to the claim of the third party plaintiffs against the third party defendant, but the only additional evidence offered were several depositions. The case was submitted on the basis of those depositions and the record in the case between plaintiff and the original defendants.

The chief factual issue not yet resolved is the identity of the boat and the operator of that boat whose conduct the court found in its earlier judgment to have been negligent. The legal issue relates to third party defendant's obligation under its charter agreement. Most of the evidence bearing on these issues was adduced at the trial of the case in main. This has now been supplemented by the depositions of certain crewboat operators as well as the owners of the crewboats servicing Derrick Barge 12.

By way of repetition, the major premise of the third party complaint is that under the charter, Offshore is obligated to indemnify McDermott and Associated for damages as the result of Offshore's alleged failure to perform the charter agreement in a workmanlike manner. Counsel for Offshore argues correctly that Associated has no claim for indemnity as it had no contract with Offshore. The charter party for rental of crewboats was between McDermott and Offshore. Associated was a subcontractor of McDermott, as was Offshore (see Halliburton Co. v. Norton Drilling Co., (5 Cir., 1962), 302 F.2d 431). As

to the claim against McDermott, under the Court's findings the operator of the crewboat was in fact a joint tort feasor and under Halcyon [Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318,] the shipowner is not entitled to contribution from such a joint tort feasor. However, this would not preclude an action of indemnity, given a proper factual situation. We doubt that this case presents such a situation. The crewboat had no responsibility for, or control of, the selection of the means of egress provided Davis, and this obligation was in no way assigned to the crewboat.

However, the primary reason why the third party demand must fail is that the third party plaintiffs have not carried their burden of proving by a preponderance of the evidence that it was one of Offshore's vessels that Davis was boarding when he was injured. Only speculation and conjecture exists as to identification. The third party plaintiffs in their brief narrow the identity to the PARAMOUNT (owned by Offshore) and the MONTE CARLO (owned by someone other than Offshore). As between the PARAMOUNT and MONTE CARLO, we find no reason in the record to believe it was one of these vessels rather than the other. The plaintiff was not "fairly positive" but categorically positive that it was not the PARAMOUNT. The major premise of the argument that it was the PARAMOUNT is that the plaintiff identified Luke Savoie as "Slim" as the operator of the vessel on which he was transported. However, upon cross-examination he was not sure, but he was sure that the man who was the operator of the crewboat was called "Slim" by everybody, and that he had an 8 or 9-year old boy who went out with him on one or more occasions. It should be noted that no one else who knew Savoie called him "Slim" and that Savoie did not have a son eight or nine years old who rode on occasion with him. He had two daughters, but they never rode with him. There is one other point which has not been mentioned in any of the briefs which has caused the Court some concern. We know that the crewboat involved was not the AILINE ELIZABETH or the ALICIA VICTORIA. Everybody agrees on that. We do not believe that there is any evidence that it was the SEA SCANNER, which was not an Offshore boat. The lawyers seem to reduce the choice to the MONTE CARLO or the PARAMOUNT. On reading the depositions that were introduced after the trial, there is testimony of an additional crewboat named the GRANDEUR. The deposition of Mr. Arthur P. Landry, filed on August 14, 1968, is to the effect that the GRANDEUR was used on jobs on this location (see page 9 of that deposition). It is also with interest that the Court reads that portion of Mr. Landry's testimony to the effect that a man nicknamed "Slim" was running the GRANDEUR. Query: Could the GRANDEUR be the crewboat? Apparently neither counsel thinks so. No one has mentioned it either at the trial or by brief. It was only casually, while reading through the depositions that we became aware of its existence. I assume that there is a good reason for ruling out the GRANDEUR belonged to Offshore Crewboats, Inc. We do not have the deposition or the testimony of the man nicknamed "Slim" who Mr. Landry says was running the GRANDEUR. We do not have any logs of that vessel.

The demands of the third party plaintiffs are denied because they have not proven that any of the third party defendants' vessels were involved.