**BROWN & ROOT, INC., et al., Appellants,**

**v.**

**Warner L. DeSAUTELL, Appellee.**

**No. 16874.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

June 16, 1977.

Rehearing Denied July 21, 1977.

Vinson & Elkins, William R. Eckhardt, Houston, for appellants.

Watrous & Conner, Ira D. Watrous, Houston, for appellee.

PEDEN, Justice.

Brown & Root, Inc. and Taylor Diving & Salvage Co., Inc. appeal from a judgment rendered in favor of plaintiff, Warner L. DeSautell, under the Jones Act and general maritime law for an injury incurred when he slipped and fell while working in a submerged diving bell at sea. Appellants raise questions concerning the duty of seaworthiness, the evidence supporting the findings of unseaworthiness and negligence, and the computation of damages.

When injured, DeSautell was working as a diver for Taylor Diving from Brown & Root's barge "Hugh W. Gordon" in the North Sea on the construction of a petroleum pipeline. Taylor Diving provided the complete portable diving unit on board, including a decompression chamber and the SDC–7 diving bell in which DeSautell was injured. He and another diver had been lowered in the bell for a saturation dive to work on the pipeline, and while he was assisting his partner with his mask, DeSautell's foot slipped off the rim of the open lower hatch and he fell partially through the hatch, injuring his back.

A trial to the court resulted in a joint and several judgment against Brown & Root on a finding of unseaworthiness and against Taylor Diving on a finding of Jones Act negligence.

■ Appellants' first point of error asserts that Brown & Root owed him no warranty of seaworthiness since he was an employee of an independent contractor. The United States Supreme Court resolved this question in *Alaska Steamship Co. v. Petterson,* 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), aff'g per curiam 205 F.2d 478 (9th Cir. 1953), holding that a vessel owner owed the absolute duty of seaworthiness to an employee of an independent contractor who, while working on a ship, was injured by an unseaworthy appliance, even though it was supplied by an independent contractor.

■ Appellants' second point, urged for Brown & Root, is that the trial court erred in finding that DeSautell was a member of the crew of the Hugh W. Gordon since he was an employee of an independent contractor who neither owned nor operated the vessel and his work as a diver was not traditionally done by members of the crew of the vessel. The appellants present both no evidence and insufficient evidence arguments under this point.

In addition to finding that DeSautell was a member of the crew of the Hugh W. Gordon the trial court found that he was a seaman under the general maritime law and the Jones Act, a finding that is not disputed by appellants. "Seamen", as used in the Jones Act, and "members of the crew" are equivalent terms. *Travelers Insurance Co. v. Belair,* 412 F.2d 297 (1st Cir. 1969).

". . . the difference between the two terms 'seaman' and 'member of the crew of any vessel' is so slight as to be virtually indiscernable and, for all practical purposes, may be disregarded." *Boatel, Inc. v. Delamore,* 379 F.2d 850, 859 (5th Cir. 1967).

Either finding, that DeSautell was a member of the crew or that he was a sea-man, would make him eligible to recover under the Jones Act.

"[T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel . . . or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission . . . ." *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir. 1959).

It is clear that DeSautell's work was being performed on the vessel or attached to it by life-supporting lines. Marine divers are held to be seamen. *Smith v. Brown & Root Marine Operators, Inc.,* 243 F.Supp. 130 (D.C.La.1965), aff'd, 376 F.2d 862 (5th Cir. 1967). Although the appellants denied that DeSautell was a member of its crew, they admitted that his "job function did contribute to the mission of the Hugh W. Gordon on the date in question." We hold that the trial court had adequate support for its finding that DeSautell was a member of the crew of the vessel.

■ Appellant next asserts that any recovery by the plaintiff against Taylor Diving must be based on negligence because Taylor diving owes the plaintiff no duty of seaworthiness. We agree, and the trial court's judgment against Taylor Diving was based on findings of negligence.

Appellants' fourth and fifth points of error are no evidence and great weight points as to the trial court's twelfth finding, that the Hugh W. Gordon and the diving bell were unseaworthy because of the following conditions:

1. There was no safety screen or covering for the open hatch of the diving bell to protect the divers from an unreasonably dangerous condition confronting them as they were getting ready to make their dive.
2. The rim of the hatch was constructed of smooth stainless steel which, when the hatch cover was open, became extremely slippery and resulted in an unreasonably dangerous condition.

3. No provision had been made to prevent slipping when the ring of the hatch had become slick and dangerous.

4. The diving bell had no safety straps, railings, bars or handholds for divers to grasp in an effort to prevent falling on the wet and dangerous surface on which divers had to stand.

■ The owner of a vessel is not obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The appellants have raised great weight points as well as no evidence points, so we have carefully examined the entire record.

■ The first condition found by the trial court to cause unseaworthiness was the absence of a safety screen or covering for the open hatch. Appellant initially argues that a finding of unseaworthiness cannot be predicated on an unknown and untested device. However, the fact that the device used is customary in the trade is not the legal measure of the duty of seaworthiness. *Little v. Green,* 428 F.2d 1061, 1066 (5th Cir. 1970); *Davis v. Associated Pipe Line Contractors, Inc.,* 305 F.Supp. 1345, 1349 (D.C. W.D.La.1968), aff'd per curiam, 418 F.2d 920 (5th Cir. 1969).

■ The diving bell lowers divers to the sea bottom, but their work is done outside it. It also serves as a refuge for them when they are working. The diameter of the diving bell was some 61⅛ inches. The open hatch was 25 inches in diameter and had a 2½ inch wide stainless steel rim around it. It has to be very smooth if it is to effect a seal with the hatch cover. This rim, or ring, located in the middle of the bell's floor, was surrounded by a circular, nonskid deck plate only about 15½ inches wide. Various tools, belts, lines, pipes, some 300 feet of hose, other equipment used by the divers, and a scrubber (pump) were usually on the wall or the floor, leaving little room to stand or move in. When the diver pulled down a hinged seat and sat on it while putting on his diving gear, still less room was left for the one helping him, as DeSautell was when he was injured.

When the crew above would turn on the hot water hose that was to be attached to the diver's suit, the water would run onto the floor of the bell and out through the hatch. There was evidence that even when there was no water flowing or standing on the rim it was always wet when the hatch was open. The bell was kept in motion by wave action of the sea. When it was lowered to the depth of more than 200 feet, where the diver was to work outside the bell, the pressure in the bell would customarily be reduced by those controlling it on board the vessel, and the hatch would pop open. The divers would secure it and then the "tender" (the diver acting as helper) would usually seat the diver in front of him, stand facing him with one foot on each side of the open hatch rim, and help him hook up his hot water hose, safety latch, rubber webbing, and diving mask. The trial court heard lengthy testimony on the feasibility of a covering for the open hatch. Appellee's witness, Ron Martinez, who has done no design work but is an experienced deep sea diver, described and drew a blackboard sketch of a temporary safety grating of metal covered by plastic he said could be designed to give the helper a better place to stand while assisting the diver. Mr. Robert McArdle, Senior Vice President of Taylor Diving, after having testified that he thought the proposed grating "would be a little on the dangerous side, because the divers' lines must exit the diving bell through the open hatch and because a diver's tender (helper) might need to quickly go out through the hatch in case of an emergency," admitted that a covering would be possible.

Mr. W. R. Bryant, an engineer who designs diving bells, testified that stainless steel is the best material for the rim surface, that he was not aware of any non-skid surface or even of any less slippery surface that would allow a seal to be effected.

There is a piece of rubber that goes around the hatch, is inserted in a groove in the hatch, and seals the gap between the hatch and the rim when the hatch is closed and pressure is applied to it. This seal must be tight if the bell is to be used. If the pressure in the bell got low enough, the hatch would pop open. Mr. Bryant also stated that he has never seen a temporary cover over the hatch opening of a diving bell and also thinks it might be harmful because it might slow the helper in his efforts to leave the bell to help the diver if an emergency arose.

We hold that the trial court had sufficient evidence to support its finding that the lack of a covering for the hatch constituted an unseaworthy condition. We have examined other evidence on this subject appearing throughout the record, but we think no useful purpose would be served by reviewing all of it.

The second and third conditions found unseaworthy, the smooth stainless steel construction of the hatch rim, which became slippery when wet, and the lack of a provision to prevent slipping when the ring of the hatch had become slick and dangerous, are related findings. The smooth, stainless steel ring does not rust and thus appears to be about the only surface on which the hatch can achieve an adequate seal. The ring appears to be "reasonably fit for its intended use" as required by *Mitchell v. Trawler Racer, Inc.,* supra, unless it was unreasonably dangerous. Appellee adduced evidence that under the general conditions that exist when the work is being done, the deck was sometimes covered with water and such substances as a silicone lubricant, soapy build-up from showers, grease, and diesel oil. There was testimony that a soapy film was deposited on the rim from the showers taken by the divers inside the bell after each dive; when the bell was subsequently lowered into the water, the soap would float up from the bilges onto the inner deck and the rim. Diesel oil and grease were said to be brought into the bell after the divers had worked on a leaky pipe or after they had lubricated their equipment. DeSautell did not see any of these substances on the hatch rim when he slipped; he assumed that they were present at that time.

We hold that the evidence concerning the slippery wet surface was sufficient to uphold the court's findings on the unreasonably dangerous condition of the rim surface. We overrule the appellants' fourth and fifth points of error without reaching the last condition listed under Finding No. 12.

■ Points of error six and seven challenge the evidentiary support for the trial judge's thirteenth finding of fact, that Taylor Diving was guilty of negligence under Jones Act standards:

1. In failing to provide a safety screen or covering for the open hatch to protect divers from an unreasonably dangerous condition confronting them as they were outfitting themselves preparatory to making their dive.

2. In failing to provide a non-skid surface over the stainless steel rim of the hatch to protect against slipping when the hatch cover had been opened and the rim had become wet.

3. The failure to provide any type of safety strap, railing, bar or handhold for divers within the bell to grasp to protect them from falling should they slip on the slippery surface where they had to stand in making preparation to make their dive.

The sufficiency of the evidence on the failure to provide a safety screen and the failure to provide a non-skid surface over the rim of the hatch have been discussed under the finding as to seaworthiness. The trial judge's negligence finding as to the slippery rim is worded more specifically than the similar finding as to seaworthiness. We hold that the evidence amply supports the finding of negligence in the failure of Taylor Diving to provide a safety screen, a covering, or a non-skid surface over the rim.

Points eight and nine are no evidence and great weight points complaining about the trial judge's Finding # 14, that the three

stated acts of negligence were the direct and proximate cause of DeSautell's injuries. The proximate cause standard under Jones Act negligence was stated in *Ferguson v. Moore-McCormack Lines, Inc.,* 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). The test is ". . . whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." We overrule these points. There was sufficient evidence that failure to provide a screen, or a covering, or a non-skid surface over the rim of the hatch played at least a slight part in producing the appellee's injury.

■ Point ten contends that the trial court erred in failing to find, from undisputed evidence, that DeSautell's negligence in failing to keep a proper lookout on where he was placing his feet was a proximate cause of the accident. DeSautell testified that he wasn't watching his foot when he slipped, but he also testified that the fact that the floor was slippery was what caused it to slip. The trial court was entitled to conclude that he was not negligent in failing to look at his feet while assisting his partner with his mask. The appellants also contend that DeSautell was standing in a dangerous position. They suggest that he should have stood on one side of the rim or straddled it and remained on the non-skid surface. The trial court could properly have concluded from the evidence that appellee's method of straddling the rim was not negligent since others testified that this was customary in view of the constraining size of the bell and the equipment it contained. We cannot say the trial judge was compelled to find DeSautell negligent as a matter of law.

In their eleventh point of error the appellants assert that the trial court erred in computing the amount of damages because (1) the court used a 5% wage growth rate, an inflationary trend which is a part of the wage price inflationary spiral, and (2) the court used a discount rate of only 4% per annum whereas, under the evidence, a discount rate of at least 5.93% per annum

should have been used. Appellants' twelfth point is a great weight point directed to the same computations.

The trial judge's eighteenth finding of fact includes this statement: "Plaintiff's lost wages were computed based on an annualized earning of $34,000 in the year 1973, with a growth rate thereafter of 5% per year. The court found that Plaintiff could have dived for nine more years, from the date of injury in August of 1973 through the year 1982, and that those lost wages discounted at 4% to present day value were $321,065." Lost wages from 1982 through 2000 were found, when discounted at 4%, to have a present day value of $71,-023.

■ The amount of damages sustained by an injured person is a question of fact, and we will not tamper with the district court's determination unless it is clearly erroneous. *Neal v. Saga Shipping Co.,* 407 F.2d 481 (5th Cir. 1969), cert. denied, 395 U.S. 986, 89 S.Ct. 2143, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969).

Dr. Roy F. Gilbert, an economist called by the plaintiff, testified that in calculating plaintiff's lost future earnings he excluded any consideration of an inflation factor. He allowed for future increases in earnings a growth rate of 7.3% per annum for one period; this is a rate he based on the average rate of compensation of all non-farm workers in the United States over the past ten years. For another period, he used a growth rate of 6.01%, the average rate of increase in the Federal minimum wage from 1938 to date. He used a discount rate of 5.93%. Dr. Gilbert testified on cross-examination:

"Q Now you have used a growth rate which is higher than the discount rate?

A That's correct.

Q It is your opinion that that is economically correct to use a growth rate higher than the discount rate?

A Yes, sir. If you look at the average difference between the rate of increase in wages over the last 30

years and the rate of interest, you find that the average difference is about 1.4% per annum; that the average rate of increase in wages in the United States has averaged about 1.4% above the rate of interest on U. S. securities and, well, the difference between my growth rate of 7.3% and the 5.93% is just about 1.4%. It's not quite, but—this 5.93 is based on current level of interest rate and there is some current fluctuation from year to year and month to month.

Q Not being an economist, I'm a little bit puzzled as to why the growth rate doesn't reflect inflation. Can you explain to me why it doesn't or whether it does?

A I don't know what you mean by inflation. What do you mean by "reflect inflation"? During this period of ......

Q (Interrupting) Isn't the growth rate at least in part caused by inflation?

A No, sir.

Q Well now, if you had included inflation in this calculation, what would you have put in there that you didn't put in?

A I might have added in additional cost of living factor based on what I might have estimated to be the future rate of inflation. I personally don't think that an appropriate thing to do because, in fact, very few workers in the economy today are guaranteed that their real wages will stay constant and by adding in this inflationary factor, that would be, in fact, guaranteeing Mr. DeSautell something that he hadn't had and wouldn't have been expected to have had, so I wouldn't have considered that to be an appropriate thing to do.

But, if I were to have added it in, an inflationary factor, I would have added in some percentage based on some forecast of future rate of inflation.

Q It is your testimony that in no way does the growth rate that you have used tie in to inflation?

A This growth rate is not due to the rate of inflation. I have not considered the rate of inflation and I have not added in any additional factor for the amount of increase in wages due to inflation.

Mr. Richard Camus, a consulting actuary, was called as an expert witness by the defendants. He calculated the wages which it was anticipated that DeSautell would lose as a result of his injury, applying no growth factor "because there is some question as to what is inflation and what is not. . . . Okay. Let's do another calculation at 5% growth. . . ." He later said that it is debatable whether wage increases contain inflation factors. Further, that two types of wage increases are operating on an individual, those that are economy-wide and those that apply to one's position, occupation and age. As to the former, he used a 27-year period and found the average rate increase to be 5.09% a year, using the most widely-based index that he knows of. "So we felt that 5% was reasonable", pointing out that based on past history the average is likely to return to normal because we are looking at 27 years.

We hold that under the evidence in this case the trial judge was entitled to conclude that a 5% annual growth rate should reasonably be applied in calculating DeSautell's loss of ability to earn money in the future. We hold that the testimony we have recited makes inapplicable the holdings in *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir. 1975), cert. denied, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 and in *Davis v. Hill Engineering,* 549 F.2d 314 (5th Cir. 1977). In those cases the evidence showed that the growth rate was based on inflation. Further, the expert witnesses in our case may be considered to be in agreement that an annual growth rate of at least 5% is now predictable.

We also overrule appellants' complaint as to the 4% discount rate. The ascertained future benefits ought to be dis-

counted in making up the award. The discount should be based on the yield paid by investments in safe securities, without expecting the beneficiary to exercise financial experience and skill. *Chesapeake & Ohio Railway v. Kelly*, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916); *Johnson v. Penrod Drilling Co.*, supra.

In our case, DeSautell was not shown to possess any skill as an investor. Dr. Gilbert testified that he selected a discount rate of 5.93% because he thought an individual without any expert financial ability could reasonably be expected to earn that amount over a period of 25 years in the future. Further, that this rate is based on the current rate of various high yield, but he also testified that he did not know of any insurance company that would guarantee a 4% return on an annuity for 24 years in the future.

The defendants' expert witness testified that a discount rate of 7%, based on the yield of long-term government bonds, would be reasonable.

We hold that the eminent trial judge, former Chief Justice Spurgeon E. Bell, was not bound to accept the opinion evidence and was entitled to conclude that a discount rate of 4% should be applied. Opinion evidence is but evidentiary and is seldom binding on the trier of facts, who can exercise considerable judgment of his own about how far the opinions are to be relied on. *Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167 (1958).

Appellants contend in their last point of error that the trial court's award of $125,000 for pain and suffering and for future medical expense is excessive by at least $100,000. After examining all the evidence we cannot say the trial judge erred in failing to order a larger remittitur than that he has already required.

DeSautell has filed a motion to dismiss this appeal for want of jurisdiction, attacking the adequacy of appellants' cost bond and supersedeas bond. He contends that they are ineffective to perfect appeal or stay execution because the surety, High-

lands Insurance Company, is a wholly-owned subsidiary of Halliburton Co. (as are both of the appellants) and is the liability insurer of both of them. DeSautell says these relationships render Highlands' position as surety untenable because the bonds give him no additional security other than the solvency of the original obligors and therefore are not "good and sufficient" bonds as required by § (a) of Rule 364, Texas Rules of Civil Procedure.

We deny the motion. The surety in this case is a separate legal entity, is not a party to the suit, its solvency is not questioned, and the bond was approved by the clerk in keeping with Rule 364. The requirements for a good and sufficient bond were met. *Universal Automobile Insurance Co. v. Culberson,* 51 S.W.2d 1071 (Tex.Civ.App.1932, no writ); *Universal Transport & Distributing Co. v. Cantu,* 75 S.W.2d 697 (Tex.Civ.App.1934, no writ). In any event, if appeal bonds are found defective, the appellants may be allowed to amend them. Rule 430.

The judgment of the trial court is affirmed.